FOREMOST FARMS USA COOPERATIVE,
Plaintiff-Respondent-Cross-Appellant,

v.

PERFORMANCE PROCESS, INC.,
Defendant-Respondent-Cross-Respondent,

MURNCO, INC., Defendant-Third-Party
Plaintiff-Respondent-Cross-Respondent,

NELSON JAMESON, INC., Defendant-Third-Party
Plaintiff-Appellant-Cross-Respondent,

v.

GEMINI INSURANCE COMPANY,
Third-Party Defendant,

CINCINNATI INSURANCE COMPANY,
Third-Party Defendant-Respondent-Cross-
Respondent.

Court of Appeals

*No. 2004AP1201. Submitted on briefs February 6, 2006.
—Decided November 16, 2006.*

2006 WI App 246

(Also reported in 726 N.W.2d 289.)

On behalf of the defendant-third-party plaintiff-appellant-cross-respondent Nelson Jameson, Inc., the cause was submitted on the briefs of *Jeffrey A. Schmeckpeper* and *Dustin T. Woehl* of *Kasdorf, Lewis & Swietlik, S.C.*, Milwaukee.

On behalf of the plaintiff-respondent-cross-appellant Foremost Farms USA Cooperative, the cause was submitted on the briefs of *Harry Sauthoff, Jr.*, of *LaRowe, Gerlach & Roy, LLP*, Sauk City.

On behalf of the defendant-respondent-cross-respondent Performance Process, Inc., the cause was submitted on the brief of *Todd Joseph Koback* and *Thomas Terwilliger* of *Terwilliger, Wakeen, Piehler & Conway, S.C.*, Wausau.

On behalf of the defendant-third-party plaintiff-respondent-cross-respondent Murnco, Inc., the cause was submitted on the brief of *Randall Skiles* of *Skiles Law Office*, Madison.

Before Lundsten, P.J., Vergeront and Higginbotham, JJ.

¶ 1. LUNDSTEN, P.J. This appeal requires us to determine whether, under the economic loss doctrine, tort claims were properly dismissed at the summary judgment stage. In particular, we examine whether undisputed facts show that the damaged property was not, in a legal sense, "other property" with respect to an allegedly defective product. Under the economic loss doctrine, when an allegedly defective product damages "other property," tort claims are not barred. Wisconsin courts use two tests to determine whether damaged property is "other property": the "integrated system" test and the "disappointed expectations" test. Foremost Farms USA Cooperative and Nelson Jameson, Inc., argue that the circuit court improperly dismissed Foremost's tort claims against Performance Process Inc. (Performance Corp.) and Murnco Inc., the producer and distributor, respectively, of an allegedly defective defoamer product. We agree that the tort claims were improperly dismissed. We conclude that there are disputed issues of fact under the "integrated system" test and the "disappointed expectations" test and, therefore, reverse the judgment granting summary judgment in favor of Performance Corp. and Murnco and remand with directions.

### Background

¶ 2. Performance Corp. manufactures a defoamer used to reduce foaming during the production of food

729

products. Performance Corp. distributed the defoamer through Murnco and labeled it as Murnco defoamer. Although Murnco never physically possessed the defoamer, Murnco supplied the defoamer to Nelson Jameson, a retailer. Nelson Jameson, in turn, sold the defoamer to Foremost. Foremost used the defoamer in the production of dairy products.

¶ 3. The posture of this case on appeal pits Foremost and Nelson Jameson against Performance Corp. and Murnco. For the most part, Foremost and Nelson Jameson make the same arguments. Similarly, Performance Corp. and Murnco make nearly all of the same arguments. The dispositive factual and legal issues are unaffected by the fact that Murnco acted as a middleman distributor for Performance Corp. or the fact that Nelson Jameson was the retailer to Foremost. Therefore, with some exceptions that will be apparent, we will refer to Performance Corp. and Murnco collectively as Performance Corp. in the remainder of this opinion. Similarly, we will generally refer to Nelson Jameson and Foremost collectively as Foremost. That is, we will discuss this case as if it involved only the end-user, Foremost, purchasing the defoamer directly from the manufacturer, Performance Corp.[1]

---

[1] The record before us does not indicate any interaction between Foremost and Performance Corp. when Foremost agreed to purchase the defoamer. Rather, Foremost interacted with Nelson Jameson, the retailer, and Nelson Jameson interacted with Performance Corp. and Murnco. Despite the lack of privity between Foremost and Performance Corp., the economic loss doctrine is applicable. "[T]he economic loss doctrine precludes a commercial purchaser from recovering in tort from a manufacturer for solely economic losses, regardless of whether privity of contract exists between the parties." *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 398–99, 413,

¶ 4. For purposes of our summary judgment analysis, the following facts are not disputed.

¶ 5. Foremost produces dairy products. The production of some of its dairy products involves an ingredient known in the industry as "recon." Recon is reconstituted milk produced by mixing dry milk powder with water. Foremost produces recon at a plant in Sparta, Wisconsin, and then ships the recon to its other plants where it is used to make end dairy products, such as cheese and ice cream.

¶ 6. In May 2000, Foremost determined that it had a problem with excessive foaming in the production of recon at its Sparta plant. That month, Foremost began purchasing and using a defoamer manufactured by Performance Corp. As expected, the defoamer worked to reduce the foam in the processing of recon, and Foremost periodically purchased Performance Corp.'s defoamer in fifty-five-gallon drums. Prior to May 2000, Foremost did not use a defoamer in the production of its recon at its Sparta plant.

¶ 7. Foremost used Performance Corp.'s defoamer for about two years without incident. In August 2002, Foremost discovered that some of its end dairy products were defective. More specifically, they were "off odor and off flavor," rendering them unfit for human consumption. Foremost determined that the defective products were made with a batch of recon produced at its Sparta plant. Production of the particular recon batch involved defoamer from a specific fifty-five-gallon drum, drum #20372. Testing revealed that the defoamer in this drum contained phenol. The defoamer in

573 N.W.2d 842 (1998) (defendant manufacturer sold allegedly defective product to a distributor who resold the product to the plaintiff).

another Performance Corp. drum received at about the same time, drum #21713, did not contain phenol.[2]

¶ 8. An expert in the field of food science averred that, when the phenol in the defoamer interacted with bromide in water during the recon mixing process, the combination produced bromophenols. Bromophenols "impart significant chemical flavors at extremely diluted concentrations." Thus, in the expert's opinion, when the defoamer, water, and dry milk powder were mixed, the resulting recon acquired a significant chemical flavor that was later "imparted into" Foremost's end dairy products, rendering those products unfit for human consumption. There is no further information as to whether, or, if so, in what manner, the defoamer or phenol physically became a part of the finished recon or the end dairy products.

¶ 9. Foremost sued Performance Corp., seeking monetary damages in the amount of $587,118.30.[3] The complaint alleged the torts of negligence and strict

---

[2] Performance Corp. does not dispute Foremost's assertion that the second drum contained no phenol. This apparent concession is consistent with a lab report indicating that the defoamer in the problem drum contained 1200 milligrams per kilogram of phenol, while the other drum that was tested contained less than the detectable amount of phenol, .61 milligrams per kilogram.

We also note that, in an answer to an interrogatory, Foremost asserted that the problem defoamer contained bacteria which produced the phenol. Neither party suggests that it makes a difference how the phenol came to be present in the defoamer.

[3] The itemization of damages is as follows: (1) $511,810.13 for the loss of destroyed cheese, milk, and ice-cream mix products; (2) $60,762.47 in credits given to customers for bad ice-cream mix products; (3) a net total of $7,981.19 for disposing of and converting milk products ($10,625.74 incurred in disposing of bad ice-cream mix and converting bad milk products to dry animal feed, minus $2,644.55 recouped from the sale of

liability for distributing a defective product. Performance Corp. moved for summary judgment dismissing the tort claims, arguing they were barred by the economic loss doctrine. The circuit court granted the motion, concluding that the economic loss doctrine precluded tort claims. More specifically, the circuit court concluded that the damaged products did not fit the "other property" exception to the economic loss doctrine because the allegedly defective defoamer became part of an "integrated system," namely, the recon. Foremost appeals.[4]

## Discussion

### A. Summary Judgment Methodology

¶ 10. We perform summary judgment analysis *de novo*, applying the same method employed by circuit

animal feed); (4) $5,615.01 in transporting bad milk and ice-cream mix products; and (5) $949.50 in testing expenses.

[4] The full procedural history is more complicated and does not affect our legal analysis. Performance Corp., Murnco, and Nelson Jameson all filed claims, counterclaims, or cross-claims against each other. Performance Corp. and Murnco filed motions for summary judgment against Foremost and Nelson Jameson. The circuit court granted the motions, dismissing all claims and cross-claims against Performance Corp. and dismissing all tort claims against Murnco. What remained was Nelson Jameson's breach of warranty claim against Murnco. Foremost appeals the order dismissing its claims against Performance Corp. and Murnco. Nelson Jameson appeals the order dismissing all of its claims against Performance Corp. In addition, Nelson Jameson petitioned for leave to appeal a non-final order dismissing its tort claims against Murnco. We granted that petition. The only claims we directly address on appeal are the tort claims contained in Foremost's complaint and in Nelson Jameson's cross-claims and third-party complaint.

courts. *Brownelli v. McCaughtry*, 182 Wis. 2d 367, 372, 514 N.W.2d 48 (Ct. App. 1994). That method is well established and need not be repeated in its entirety. *See, e.g., Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶¶ 20–24, 241 Wis. 2d 804, 623 N.W.2d 751. Pertinent here, summary judgment is appropriate when undisputed facts show that a party is entitled to judgment as a matter of law. *Id.*, ¶ 24. When undisputed facts permit multiple reasonable factual inferences, we must infer facts in a manner most favorable to the non-moving party. *Sauk County v. Gumz*, 2003 WI App 165, ¶ 40 n.17, 266 Wis. 2d 758, 669 N.W.2d 509. "Whether an inference is reasonable is a question of law." *Hennekens v. Hoerl*, 160 Wis. 2d 144, 162, 465 N.W.2d 812 (1991).

*B. The "Other Property" Exception To The Economic Loss Doctrine*

¶ 11. When the economic loss doctrine applies, tort claims are barred. The doctrine bars tort claims by requiring "transacting parties in Wisconsin to pursue *only their contractual remedies* when asserting an *economic loss claim." Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶ 34, 262 Wis. 2d 32, 662 N.W.2d 652 (emphasis added). "Economic loss," in this context, has a particular meaning. In general, economic losses are

> damages resulting from inadequate value because the product "is inferior and does not work for the general purposes for which it was manufactured and sold." It includes both direct economic loss and consequential economic loss. The former is loss in value of the product itself; the latter is all other economic losses attributable to the product defect . . . .
>
> > "Direct economic loss may be said to encompass damage based on insufficient product value; thus,

direct economic loss may be 'out of pocket'—the difference in value between what is given and received—or 'loss of bargain'—the difference between the value of what is received and its value as represented . . . . Consequential economic loss includes all indirect loss, such as loss of profits resulting from inability to make use of the defective product."

*Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 401, 573 N.W.2d 842 (1998) (citations omitted).

■

¶ 12. Here, Foremost does not seek compensation for the difference between the value of the defoamer as received and as represented. That is, Foremost does not seek "direct" economic loss damages. Rather, Foremost seeks "consequential" economic damages based on its assertion that the defoamer damaged "other property." Tort actions based on damage to "other property" are not barred by the economic loss doctrine. *See Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 247, 593 N.W.2d 445 (1999) ("The economic loss doctrine does not preclude a product purchaser's claims of personal injury or damage *to property other than the product itself.*" (emphasis added)).

¶ 13. The economic loss doctrine is multifaceted; but, in this appeal, we need only address the "other property" exception. The dispositive question is whether Foremost's recon and end dairy products are "other property" with respect to Performance Corp.'s defoamer. If they are "other property," as that term is used in economic loss doctrine parlance, Foremost's tort claims based on damage allegedly caused by the defoamer were improperly dismissed.

¶ 14. Regardless whether property is other property in a literal sense, it may be "other property" in a

735

legal sense for purposes of the economic loss doctrine. *See Grams v. Milk Prods., Inc.*, 2005 WI 112, ¶¶ 27, 31, 283 Wis. 2d 511, 699 N.W.2d 167. At least two tests are used to determine whether damaged property is "other property" in a legal sense: the "integrated system" test and the "disappointed expectations" test. *Id.*, ¶¶ 27–28, 31. We discuss both below and then, in subsequent subsections, apply them.

¶ 15. Under the "integrated system" test, we look to see whether the allegedly defective product is a component in a larger system. *Id.*, ¶ 27. "[O]nce a part becomes integrated into a completed product or system, the entire product or system ceases to be 'other property' for purposes of the economic loss doctrine." *Selzer v. Brunsell Bros.*, 2002 WI App 232, ¶ 38, 257 Wis. 2d 809, 652 N.W.2d 806. If a product has no function apart from its value as a part of a larger system, the larger system and its component parts are not "other property." *See Grams*, 283 Wis. 2d 511, ¶ 30. Thus, for example, defective leaking windows that damage framing and walls around the windows do not damage "other property" because windows and walls are part of an "integrated system," namely, a building. *Id.*, ¶¶ 29–30 (citing *Bay Breeze Condo. Ass'n v. Norco Windows, Inc.*, 2002 WI App 205, 257 Wis. 2d 511, 651 N.W.2d 738). The windows are part of an "integrated system" because they have " 'no function apart from the buildings for which they were manufactured.' " *Grams*, 283 Wis. 2d 511, ¶ 30 (quoting *Bay Breeze*, 257 Wis. 2d 511, ¶ 27).[5]

---

[5] Foremost urges us to adopt what it views as a corollary principle: If an allegedly defective product has no function in the larger system, the larger system and its components must be deemed "other property" with respect to the allegedly defec-

¶ 16. If damaged property is not "other property" under the "integrated system" test, the economic loss doctrine applies and tort claims are barred. The "other property" inquiry ends. However, if the damaged property appears to be "other property" under the "integrated system" test, then the "disappointed expectations" test is applied. We turn to the "disappointed expectations" test, the *Grams* court explains, because the "integrated system" test does not always produce an answer to the "other property" inquiry in keeping with the logic underlying the economic loss doctrine. *See Grams*, 283 Wis. 2d 511, ¶ 31.[6]

¶ 17. The "disappointed expectations" test is directed at determining whether the purchaser should have anticipated the need to seek protection against loss through contract. This test focuses on the expected function of the product and whether, from the purchaser's perspective, it was reasonably foreseeable that the product could cause the damage at issue. We glean this summary of the test from *Grams*.

---

tive product. Because Foremost prevails on appeal for other reasons, we need not decide whether the adoption of this rule makes sense.

[6] In *Grams v. Milk Products, Inc.*, 2005 WI 112, 283 Wis. 2d 511, 699 N.W.2d 167, the defective product was liquid feed purchased to nourish calves. *Id.*, ¶¶ 6–8. The liquid feed failed to properly nourish the purchaser's calves, resulting in weight loss and a significantly increased death rate. *Id.*, ¶ 8. Without expressly saying so, the *Grams* court concluded that, if the "integrated system" test was the only test considered, the damaged calves would be deemed "other property," thereby putting the purchaser's tort claims safely outside the reach of the economic loss doctrine.

¶ 18. The *Grams* court explained that the "disappointed expectations" test is met when " 'prevention of the subject risk was one of the contractual expectations motivating the purchase of the defective product.' " *Id.*, ¶ 43 (quoting *Rich Prods. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 975 (E.D. Wis. 1999)). Further, the "determination of whether particular damage qualifies as damage to 'other property' [under the "disappointed expectations" test] turns on the parties' expectations of the function of the bargained-for product." *Grams*, 283 Wis. 2d 511, ¶ 32. Thus, for example, livestock, damaged as a result of a grain silo that failed to perform as expected in that it did not enrich feed stored in it, was not "other property" because the damage to the livestock stemmed from the failure of the silo to perform as expected. *Id.*, ¶ 34 (citing *D'Huyvetter v. A.O. Smith Harvestore Prods.*, 164 Wis. 2d 306, 328, 475 N.W.2d 587 (Ct. App. 1991)).

¶ 19. The "disappointed expectations" test asks whether the damage was " 'reasonably foreseeable' " should the purchased product prove to be defective, such that the purchaser, at least in theory, could have obtained protection in contract. *See Grams*, 283 Wis. 2d 511, ¶ 31 n.8 (quoting *Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.*, 843 F. Supp. 1027, 1060 (D.S.C. 1993)). Because the focus is on "reasonable foreseeability," it follows that an objective standard applies: Should a reasonable purchaser in the plaintiff's position have foreseen the risk?

¶ 20. We note that "reasonable foreseeability" should not be equated with "foreseeable interaction" between the purchased product and the damaged prop-

erty. Foreseeable interaction, by itself, does not show that damage was reasonably foreseeable within the meaning of the "disappointed expectations" test. We broach this topic because a sentence in *Grams* might be read to suggest otherwise. The *Grams* court stated: "If a product is expected and intended to interact with other products and property, it naturally follows that the product could adversely affect and even damage that property." *Grams*, 283 Wis. 2d 511, ¶ 47. Read in isolation, the sentence seemingly suggests that, any time a purchaser knows a product will come into some sort of contact with other property, the purchaser should anticipate that the purchased product may damage the other property and bargain accordingly. But the full discussion in *Grams* indicates that foreseeable interaction, by itself, is not enough.

¶ 21. For example, the *Grams* court discussed our decision in *Tony Spychalla Farms, Inc. v. Hopkins Agricultural Chemical Co.*, 151 Wis. 2d 431, 444 N.W.2d 743 (Ct. App. 1989). In *Spychalla*, we held that the economic loss doctrine did not bar a tort action where chemical dust, applied to potato seed, performed its intended function of preventing rot, but also caused "unanticipated" damage when it caused the seed to petrify, resulting in a significantly reduced crop. *See Grams*, 283 Wis. 2d 511, ¶¶ 38–39. While the *Grams* court suggested that the proper application of the "disappointed expectations" test might have led to a different result, the court also acknowledged that our result may have been correct. The *Grams* court commented:

> There is a chance that a similar case would be decided differently today, realizing . . . that it would not be unreasonable for the parties to anticipate a risk that the chemical dust could damage potato seed. In a new

case, the result could turn on the purpose for purchasing the product, the reasonableness of anticipating a risk of the product's failed performance, the availability of warranties or risk sharing mechanisms, and the extremity of the facts.

*Id.*, ¶ 40. If our *Spychalla* holding *may* have been correct, it follows that foreseeable interaction alone is not sufficient to meet the "disappointed expectations" test. This is true because there was no doubt in *Spychalla* that the chemical dust would interact with the potato seed. In sum, foreseeable interaction is a factor to consider when applying the "disappointed expectations" test, but it is not, by itself, sufficient to satisfy that test.[7]

¶ 22. In some situations, the facts speak for themselves. The *Grams* "disappointed expectations" discussion repeats, with apparent approval, a hypothetical example from our decision in *Selzer*, 257 Wis. 2d 809. *Grams*, 283 Wis. 2d 511, ¶ 36. In *Selzer*, a homeowner sought relief in tort for damage to his house caused by a defective replacement window. The window failed to perform as expected because part of it rotted. Once the window rotted, it was to be expected that the rot would spread to adjacent parts of the house. *Selzer*, 257 Wis. 2d 809, ¶¶ 35–37. Applying the "disappointed expectations" test, we concluded that the homeowner's

---

[7] Some readers may think the term "interact," used by the *Grams* court, carries with it ambiguity. Do products "interact" if they simply come into physical contact with each other? Or does the term convey something more active? For that matter, might some products "interact" even though they do not come into direct physical contact with each other? Such questions do not appear helpful because they deflect attention from the core issue of the "disappointed expectations" test, that is, whether the damage was reasonably foreseeable.

tort claim was barred because the owner did not point to any harm beyond disappointed expectations. *Id.*, ¶ 37. We then hypothesized a defective window scenario in which a tort claim could be brought:

> Had the windows resisted rot but spontaneously shattered, spewing shards of glass into an adjacent Picasso, [the homeowner] might well argue that the defective windows damaged his painting in an entirely unanticipated manner, going well beyond a failure to perform as expected and entitling him to pursue a tort remedy.

*Id.* By repeating our hypothetical, the *Grams* majority seems to be saying that in some situations damage to different property is so obviously not susceptible to reasonable anticipation that no further inquiry is needed to conclude that the "disappointed expectations" test is not met.

¶ 23. Still, it seems that resolution of the factual question—was the damage something a reasonable purchaser should have foreseen—will most often require an inquiry into what is normally known by a purchaser in the plaintiff's position. Stated differently, the ends of the spectrum are easily resolved. No one expects a glass window to spontaneously shatter and damage a nearby object. On the other hand, if a product is purchased to nourish calves, but fails the very purpose for which it was purchased, a reasonable purchaser should anticipate damage to the calves and bargain accordingly. But resolving cases in the middle of the spectrum will require a factual inquiry into what a reasonable purchaser in the plaintiff's position would have foreseen. Taking the backdrop of *Spychalla* as an example, do farmers like the one in that case normally know that a chemical applied to crops for one purpose might cause harm in a manner unrelated to the ex-

pected function of the chemical? To what extent are such farmers expected to contemplate possible damage scenarios? Finally, in theory, careful purchasers might often anticipate the desirability of obtaining contractual protection through broadly phrased clauses providing protection against all damage caused by a defective product. But is this sort of careful anticipation what the *Grams* majority contemplates, even if no manufacturer or distributor would agree to such far-reaching liability? When obtaining contractual protection is purely theoretical, is the purpose behind the economic loss doctrine advanced?[8]

¶ 24. We raise these questions in an effort to assist the litigants before us—Performance Corp. might

---

[8] A closely related question is whether a plaintiff's actual ability to negotiate contractual protection matters. Some economic loss doctrine cases seemingly suggest that the contract bargaining contemplated when addressing the "disappointed expectations" test need be only hypothetical. We say this in light of two cases indicating that actual bargaining power is not an "element" when considering application of the economic loss doctrine. *See State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 225 Wis. 2d 305, 311–12, 331, 348, 592 N.W.2d 201 (1999) (in a claim arising from a transaction between an automobile consumer and dealer, the court recognized that "[a]lthough there may be situations where the parties' bargaining power is extremely disparate, 'relative bargaining power is not the touchstone of the economic loss rule, nor even an element.'" (citations omitted)); *General Cas. Co. v. Ford Motor Co.*, 225 Wis. 2d 353, 355, 357, 361, 592 N.W.2d 198 (1999) (involving a similar claim and following *State Farm*). It goes without saying that many individual consumers have no meaningful ability to negotiate with product manufacturers and distributors. If the economic loss doctrine applies to individuals purchasing vehicles from dealers or manufacturers, as was the case in *State Farm* and *General Casualty*, it is difficult to imagine why any purchaser's actual ability to negotiate contractual protection matters.

again seek summary judgment—and others. We need not here, however, resolve ambiguities that may be present in either the "integrated system" test or the "disappointed expectations" test. As explained below, regardless of the precise tests, Performance Corp. was not entitled to summary judgment.

¶ 25. To summarize, when a defendant seeks dismissal of tort claims arguing that the economic loss doctrine applies because the damaged property is "other property" with respect to the allegedly defective product, courts should normally first apply the "integrated system" test to determine whether the damaged property is "other property." If the damaged property is not "other property" under the "integrated system" test, the economic loss doctrine applies and tort claims are barred. The "other property" inquiry ends. However, if the damaged property appears to be "other property" under the "integrated system" test, then the "disappointed expectations" test is applied.[9]

---

[9] Notably, the *Grams* majority casts doubt on the utility of the "integrated system" test by suggesting that a test based on what property is damaged, rather than on the foreseeability of the damage, is ill conceived. *See Grams*, 283 Wis. 2d 511, ¶ 47 ("A rule that allows tort recovery based on *what is damaged, rather than whether the risk of that damage was within the scope of the bargain,* would leave little room for contract." (emphasis added)). This wrong focus is why, according to the *Grams* majority, the "integrated system" test sometimes produces false negatives. It is, therefore, reasonable to ask why parties and courts should bother with the "integrated system" test. One answer is that the "integrated system" test is often easier to apply. In any event, the *Grams* majority plainly intends the retention of the "integrated system" test as one means of resolving whether property is "other property" for

## C. Application Of The "Other Property" Exception

### 1. Application Of The "Integrated System" Test

¶ 26. The parties dispute whether the recon and end dairy products were "other property" under the "integrated system" test. They disagree sharply on whether the undisputed facts show that the defoamer was a component of the recon and end dairy products.

¶ 27. Performance Corp. argues that the summary judgment submissions show it is undisputed that the defoamer was an ingredient of the recon and end dairy products for two primary reasons. First, undisputed evidence shows that the defoamer was added during the process of making the damaged recon. Second, there is no evidence that the defoamer was removed or separated from the recon. In Performance Corp.'s view, it logically follows that the defoamer was a component of both the recon and end dairy products and, therefore, part of an "integrated system."

¶ 28. In contrast, Foremost argues that it is clear the defoamer was not a component in the recon and end dairy products or, at a minimum, factual disputes remain on that issue. Moreover, according to Foremost, the question is not whether the defoamer became a component, but whether the *phenol* in the defoamer became a component.

¶ 29. Although we do not adopt the precise reasoning of either party, we agree with Foremost that a factual dispute remains as to whether the defoamer or

purposes of the economic loss doctrine. *See id.*, ¶ 27 ("Like many other states, we have incorporated the concept of an 'integrated system.' ").

the phenol were components of the recon or end dairy products within the meaning of the "integrated system" test.

¶ 30. The undisputed facts are limited. The purpose served by the defoamer was to reduce foaming during the mixing of recon. The defoamer served this purpose. The defoamer served no purpose in the final recon and end dairy products. Foremost could and did make recon and end dairy products without using defoamer. Apart from phenol, a topic we discuss separately below, so far as the evidence discloses, the defoamer may completely dissipate after it has served its function of reducing foam. There simply is no evidence as to whether the defoamer remains or disappears after it has served its function.[10] Given the state of the record, it is not undisputed that the defoamer remained as a part of the final recon or end dairy products.[11]

---

[10] Performance Corp. asserts in its appellate brief that "Foremost conceded to the circuit court that water, recon and the . . . defoamer are *ingredients* which are mixed to become the Foremost product" (emphasis added). But the record citation Performance Corp. provides does not back up its assertion. In the pleading cited, Foremost's counsel says only that the allegedly defective defoamer was used "in the recon manufacturing process." Counsel conceded only that the defoamer was "mixed" with water and then the non-fat dry milk powder. Nowhere does counsel concede that the defoamer was an ingredient in the final recon or the end dairy products.

[11] In footnote 5, we explained that we need not address Foremost's assertion that, if a product has no function in the larger system, the larger system must be deemed "other property" with respect to the allegedly defective product. We merely note here that Foremost makes the argument because the evidence, viewed most favorably to Foremost, supports the view that the defoamer has no function as a component or ingredient in the final recon or end dairy products.

¶ 31. We turn our attention to the presence of phenol in the drum containing the specific batch of defoamer at issue. The undisputed evidence shows that the damaged recon was made using a particular drum of defoamer containing phenol. Viewing the evidence in a light most favorable to Foremost, the non-moving party, that evidence supports the factual inference that phenol was a contaminant in the defoamer, rather than a defoamer ingredient.

¶ 32. Foremost used Performance Corp.'s defoamer for about two years without a problem. When Foremost discovered that some of its end dairy products were defective, testing showed that the source of the problem was phenol in defoamer from a particular drum purchased from Performance Corp. As described in more detail in the background section of this opinion, when the phenol in the defoamer interacted with bromide in water during recon mixing, the combination of the two substances produced bromophenols. The bromophenols, in turn, damaged the recon and end dairy products. Testing also showed that another drum of Performance Corp. defoamer received by Foremost at about the same time as the suspect drum did not contain phenol. A reasonable inference from this evidence is that phenol is a contaminant, rather than normal defoamer ingredient.

¶ 33. Under this view of the evidence, phenol is not, in any meaningful sense, part of Performance Corp.'s defoamer product, but instead a contaminant in a particular drum of defoamer. So far as the record discloses, the phenol served only one purpose—to damage the recon and, in turn, damage the end dairy products. At a minimum, a factual dispute remains as to whether the phenol was a component of the recon and end dairy products.

¶ 34. Accordingly, we conclude that a factual dispute remains as to whether the defoamer or the phenol were components of the recon or end dairy products within the meaning of the "integrated system" test.

2. Application Of The "Disappointed Expectations" Test

¶ 35. As stated above, determining whether damage qualifies as damage to "other property" under the "disappointed expectations" test turns on whether the purchaser should have anticipated the need to seek protection against loss through contract. The test focuses on the expected function of the product and whether, from the purchaser's perspective, it was reasonably foreseeable that the product could cause the damage at issue. The test asks whether a reasonable purchaser in the plaintiff's position should have foreseen the risk. Foreseeable interaction between damaged property and the damage-causing product is insufficient, by itself, to meet the "disappointed expectations" test. *See supra,* ¶¶ 20–21.

¶ 36. Accordingly, we ask: Does the undisputed evidence show that Foremost should have anticipated that the defoamer might function properly as a defoamer, yet contain a contaminant such as phenol that might damage Foremost's recon and, eventually, its end dairy products? Our answer is no. There is no evidence, much less undisputed evidence, showing whether a purchaser in Foremost's position should reasonably have anticipated that the defoamer would contain a contaminant such as phenol that would render Foremost's dairy products unfit for human consumption.

¶ 37. In sum, we agree with Foremost that summary judgment dismissing its tort claims was inappropriate. The summary judgment submissions do not

provide undisputed evidence that the recon and end dairy products were not "other property" under either the "integrated system" test or the "disappointed expectations" test.

### *Conclusion*

¶ 38. We reverse the circuit court's judgment granting summary judgment in favor of Performance Corp. and Murnco. We direct the circuit court to reinstate Foremost's tort claims. We do not attempt to list all of the third-party claims, counterclaims, and cross-claims that must logically be reinstated as a result of the reinstatement of Foremost's tort claims. We believe the parties and the circuit court are best situated to sort that out.

*By the Court.*—Judgment reversed and cause remanded with directions.