ACUITY, a mutual insurance company,
Plaintiff-Appellant,

VPP GROUP, LLC, Involuntary-Plaintiff,

v.

SOCIETY INSURANCE, a mutual company,
Defendant-Respondent,†

Ron STOIKES d/b/a RS Construction and Terry
Luethe d/b/a Flint's Construction, Defendants.

Court of Appeals

*No. 2009AP2432. Submitted on briefs March 8, 2010.
—Decided January 5, 2012.*

2012 WI App 13

(Also reported in 810 N.W.2d 812.)

† Petition for Review granted 5/14/12.

217

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James G. Curtis* and *Francis M. Doherty* of *Hale, Skemp, Hanson, Skemp & Sleik*, LaCrosse.

On behalf of the defendant-respondent, the cause was submitted on the brief of *James W. Mohr, Jr.* of *Mohr & Anderson, LLC*, Hartford.

Before Lundsten, P.J., Vergeront and Higginbotham, JJ.

¶ 1. HIGGINBOTHAM, J. This case arises out of damages suffered by VPP Group, LLC, stemming from construction work being performed by contractors on a building owned by VPP. VPP was insured by Acuity. Acuity paid the damage claims filed by VPP arising out of the construction work. Acuity then filed a subrogation action against the contractors and their insurer, Society Insurance. Society moved for summary judg-

ment. The circuit court granted the motion and declared that Society's CGL policies did not provide coverage for damages caused VPP by the contractors because there was no "occurrence" within the meaning of the policies under the facts of this case.[1] Because we conclude that the damages suffered by VPP are a result of an "occurrence," the economic loss doctrine does not bar coverage and no business risk exception in the policy applies, we conclude there is coverage under Society's policy. We therefore reverse the circuit court's order for summary judgment and remand to the circuit court for further proceedings.

## BACKGROUND

¶ 2. VPP, Ron Stoikes d/b/a RS Construction (RS), and Terry Luethe d/b/a Flint's Construction (Flint) entered into a contract to remove and reinstall a concrete wall on the south side of the "engine room" building which provided refrigeration and necessary utility services to VPP's entire animal processing plant. The contract, in the form of a "Bid Memo," was dated May 21, 2006, and set forth the following terms: "Bid to include labor for Removal & installation of 49' x 22' h concrete wall[;] Also include shoring & related work." The total contract price was $8500.

¶ 3. The work contracted for was limited to removal and replacement of the engine room's south wall. VPP supplied all materials; RS and Flint provided all labor. RS and Flint began work in late May 2006. RS

[1] While there are two Society CGL policies at issue in this case, because they are identical in terms of the language relevant to this appeal, for ease of understanding, we will refer to the policies in the singular throughout the rest of this opinion.

221

first shored up the engine room and removed the existing wall to grade level. The VPP processing plant continued at full operation during this phase of the work.

¶ 4. On June 12, 2006, during Flint's excavation of a trench adjacent to the south wall site, the soil began to erode from under the concrete slab of the first floor of the engine room. As a result, the engine room's first floor slab cracked and a portion deflected downward. The part of the building above the compromised floor, including the second floor and roof, likewise deflected downward. The engine room's masonry walls adjacent to the south wall also sustained damage. As a result of this damage to the engine room, the utility service to the rest of the processing plant was disrupted, including electrical service, anhydrous ammonia, and the refrigeration functions of the engine room's roof top condenser. Also, the roof top condenser was disabled because the water required to run it was too heavy for the damaged roof. Due to this damage, the entire processing plant's refrigeration capacity was reduced by twenty-five percent. In addition to the engine room itself, an adjacent building which shared a common wall incurred large cracks in the cooler housed inside it, which impaired its ability to cool processed beef.

¶ 5. Beef being processed must be rapidly cooled, and the processing is monitored by United States Department of Agriculture (USDA) on-site inspectors during all processing shifts. Because of the reduced refrigeration capacity, VPP had to change its processing schedule, adding an extra animal "kill" day, to ensure that it could fill its customer orders. Because of the need to add another "kill" day, VPP incurred costs for additional personnel hours, additional USDA inspectors' hours, extra freight and fuel charges, and other expenses in the amount of approximately $380,000.

222

¶ 6. VPP repaired the engine room by replacing that portion of the first floor concrete slab that had cracked, jacking up the second floor level to its original level and replacing portions of the roof slab that had cracked. Only after these repairs were made was RS able to complete the original job of rebuilding the south wall.

¶ 7. VPP contacted its insurer, Acuity, following the loss. After adjusting the losses, Acuity paid a total of $636,466.39 to VPP in final settlement of the loss claims, which amount included the $380,000 claimed for the extra expenses and the remainder representing the damages relating to repairs to the building. Not included in this amount were the costs to VPP related to replacing the south wall.

¶ 8. Acuity commenced this subrogation action against RS and Flint and their insurer, Society Insurance, seeking to recover damages arising from the engine room collapse, and alleging breach of contract and negligence. The applicable policy language states:

### 1. Business Liability.

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" . . . to which this insurance applies.

. . . .

b. This insurance applies:

(1) to . . . "property damage" only if:

(a) The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory" . . . .

The policy defines "Property damage" as:

a. Physical injury to tangible property, including all

223

resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

¶ 9.　The policy also includes two exclusions which Society contends bars coverage:

This insurance does not apply to:

. . . .

**k. Damage To Property**

"Property damage" to:

**(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

¶ 10.　Society moved for summary judgment, asserting that based on the above language of the CGL policy it issued to RS and Flint, there was no liability coverage for VPP's loss. The circuit court granted Society's motion for summary judgment, finding there was no "occurrence" under Society's policy. Acuity appealed. Additional facts, as necessary, are set forth in the discussion below.

## DISCUSSION

■■

¶ 11.　The issue on appeal is whether there is coverage for VPP's claims under Society's CGL policies

issued to RS and Flint. We review a grant of summary judgment de novo, applying the same methodology as the circuit court. *State v. Bobby G.*, 2007 WI 77, ¶ 36, 301 Wis. 2d 531, 734 N.W.2d 81. Summary judgment is appropriate when the affidavits and other submissions show that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. WIS. STAT. § 802.08(2). "We draw all reasonable inferences from the evidence in the light most favorable to the non-moving party." *Burbank Grease Servs., LLC v. Sokolowski*, 2006 WI 103, ¶ 40, 294 Wis. 2d 274, 717 N.W.2d 781.

■■■■■

¶ 12. The interpretation of an insurance contract presents a question of law, which we also review de novo. *Glendenning's Limestone & Ready-Mix Co. v. Reimer*, 2006 WI App 161, ¶ 19, 295 Wis. 2d 556, 721 N.W.2d 704. "Judicial interpretation of a contract, including an insurance policy, seeks to determine and give effect to the intent of the contracting parties." *American Family Mut. Ins. Co. v. American Girl, Inc.*, 2004 WI 2, ¶ 23, 268 Wis. 2d 16, 673 N.W.2d 65. "The language in an insurance contract should be given its ordinary meaning—the meaning a reasonable person in the position of the insured would give the terms." *Kalchthaler v. Keller Constr. Co.*, 224 Wis. 2d 387, 393, 591 N.W.2d 169 (Ct. App. 1999). We do not interpret insurance policies, however, "to provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium." *American Girl, Inc.*, 268 Wis. 2d 16, ¶ 23.

I. There is an "occurrence" under Society's CGL policy.

A. VPP's claimed damages from the collapse of the engine room constitute "property damage" caused by an "occurrence" under Society's CGL policy.

¶ 13. Acuity argues that the partial collapse of the engine room that resulted from faulty excavation techniques by Flint constitutes an "occurrence" under the CGL policy. Society contends that the circuit court correctly found that there was no "occurrence" under the policy. We agree with Acuity that the partial collapse of the engine room was an "occurrence" under Society's CGL policy.

■■
¶ 14. To determine whether a claim is covered by a liability insurance policy, courts use a three-step process. *See id.*, ¶ 24. "First, we examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage." *Id.* "If an initial grant is triggered, we look to see if any exclusions apply." *United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶ 8, 304 Wis. 2d 750, 738 N.W.2d 578 (quoting *State Farm Fire & Cas. Co. v. Acuity*, 2005 WI App 77, ¶ 8, 280 Wis. 2d 624, 695 N.W.2d 883). "We strictly construe exclusions against the insurer." *Id.* Finally, if an exclusion applies, "we then look to see whether any exception to that exclusion reinstates coverage." *American Girl, Inc.*, 268 Wis. 2d 16, ¶ 24. Neither party contends that any exception to the exclusions applies, nor do we find one; accordingly, our analysis is limited to the first two steps.

¶ 15. We begin with the policy language and then examine the factual pleadings to determine whether there is an initial grant of coverage. Under the CGL policy, to trigger coverage, there must be "property

226

damage" caused by an occurrence. "Property damage" is defined within the policy as "physical injury to tangible property, including all resulting loss of use of that property." The damage to the engine room, the roof, and the resulting damage to the equipment is plainly "physical injury to tangible property." Society appears to concede that property damage occurred.

¶ 16. The parties' dispute focuses on what constitutes an "occurrence" under the CGL policy. An "occurrence" is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful condition." The supreme court in *American Girl* looked to the following dictionary definitions in defining "accident" as that term is not defined in the policy. *Id.*, ¶ 37. They found in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE the term "accident" defined as "an event or condition occurring by chance or arising from unknown or remote cause." *American Girl*, 268 Wis. 2d 16, ¶ 37 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 11 (2002)). BLACK'S LAW DICTIONARY defined "[t]he word 'accident,' in accident policies, [to] mean[] an event which takes place without one's foresight or expectation. A result, though unexpected, is not an accident; the means or cause must be accidental." *American Girl*, 268 Wis. 2d 16, ¶ 37 (quoting BLACK'S LAW DICTIONARY, 15 (7th ed. 1999)).

¶ 17. We conclude the factual pleadings in the amended complaint allege "property damage" caused by an "occurrence" within the meaning of Society's CGL policy. The amended complaint alleges that Terry Luethe of Flint was in the process of excavating a trench adjacent to the south wall of the engine room when the excavation undermined the subgrade soil,

such that the soil under the south side of the engine room unexpectedly eroded. This caused the first floor concrete slab, on which shoring columns had been placed to stabilize the building, to crack and buckle, resulting in the collapse of a portion of the building, including the second floor and roof structures, and damage to equipment and an adjacent building. It is clear that this damage was caused by the accidental soil erosion that occurred because of faulty excavation techniques. Accordingly, the "property damage" was caused by an "occurrence" within the meaning of the CGL policy.

¶ 18. Our conclusion that the soil erosion is an "occurrence" under the CGL policy is supported by *American Girl*, *Glendenning's*, and *Kalchthaler*.

¶ 19. In *American Girl*, the Pleasant Company entered into a contract with Renschler Company for the design and construction of a distribution warehouse. *American Girl*, 268 Wis. 2d 16, ¶ 11. Due to the condition of the construction site, Renschler hired a soils engineer to provide a soil conditions analysis. *Id.*, ¶ 12. The engineer concluded that the soil conditions were poor and recommended a methodology for preparing the soil. *Id.* The recommendation was carried out by Renschler and the warehouse was constructed. *Id.*, ¶ 13. After the Pleasant Company took occupancy, the warehouse began to sink, causing damages to it as a result of the settlement. *Id.*, ¶¶ 13–14. The Pleasant Company then claimed that negligence on the part of the soils engineer caused its damages and, as a result of that negligence, Renschler had breached its contract with the Pleasant Company. *Id.*, ¶ 17. American Family, Renschler's insurer under a CGL policy, asserted that there was no "occurrence" under the policy. *Id.*, ¶¶ 14, 39.

¶ 20. In concluding that there was an "occurrence" within the meaning of the CGL policy, the *American Girl* court specifically distinguished between what could be considered "faulty workmanship" and what was the "accident." *Id.*, ¶¶ 5, 38. Specifically, the court held that it was not the soil engineer's inadequate site-preparation advice that was a cause of this exposure to harm; rather, it was the soil settlement itself (which as the cause of the harm was not intended, anticipated or expected) that constituted the "occurrence." *See id.*

¶ 21. We applied the *American Girl* reasoning in our analysis of a substantially identical insurance clause relating to property damage resulting from an "occurrence" in *Glendenning's*. In *Glendenning's*, owners and tenants of a dairy facility sued their general contractor for breach of contract and implied warranty arising out of various subcontractors' alleged negligent improvements to the facility. *Glendenning's*, 295 Wis. 2d 556, ¶¶ 2, 4. The plaintiffs alleged various deficiencies in the subcontractors' work and various items of damages, including damage by a manure scraper to improperly installed rubber mats. *Id.*, ¶ 6.

¶ 22. In analyzing whether this was an "occurrence" under the insurance policy, we relied on the analysis in *American Girl*. Based on this analysis, we concluded that while faulty workmanship itself is not an "occurrence," where improperly installed mats incurred damage from the normal use of a manure scraper to clean them, this "damage" "was caused by an accident in that the damage was not intended or anticipated." *Glendenning's*, 295 Wis. 2d 556, ¶¶ 26–27 (quoting *American Girl*, 268 Wis. 2d 16, ¶¶ 39, 42). It therefore constituted an "occurrence" under the policy. *Id.* (citing *American Girl*, 268 Wis. 2d 16, ¶ 38).

¶ 23. In *Kalchthaler*, this court determined that there was a covered "occurrence" where the parties agreed that the subcontractor's faulty work resulted in windows that leaked, causing water damage to the interior of a residence. *See Kalchthaler*, 224 Wis. 2d at 391. In determining what constituted an "occurrence" under the policy, we stated:

> Property damage, as defined by the policy, means physical injury to tangible property. Here, water entering leaky windows wrecked drapery and wallpaper. This is physical injury to tangible property. An occurrence, as defined by the policy, is an accident. An accident is an "event or change occurring without intent or volition through carelessness, unawareness, ignorance, or a combination of causes producing an unfortunate result." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 11 (1993). Here, the parties have stipulated that fifty percent of the damages were due to [the subcontractors'] negligence. Furthermore, there is no question that an event occurred: the window leaked. This is an accident. So we have property damage caused by an occurrence and the policy applies.

*Id.* at 397. In short, the "occurrence" in *Kalchthaler* was the leaking of the windows; it was not the faulty workmanship.

¶ 24. The lessons of *American Girl*, *Glendenning's*, and *Kalchthaler* are that while faulty workmanship is not an "occurrence," faulty workmanship may cause an "occurrence." That is, faulty workmanship may cause an unintended event, such as soil settling in *American Girl*, the leaking windows in *Kalchthaler*, or, in this case, the soil erosion, and that event—the "occurrence"— may result in harm to other property.

230

¶ 25. We understand Society's argument to be that there was only one act—the faulty excavation—that led to the engine room collapse and because faulty workmanship cannot constitute an "occurrence," there was no "occurrence" under the policy. To support that position, Society cites two intentional tort cases for the proposition that there must be two acts—a cause and an effect—and it is the effect that is the "occurrence." *See Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 86, 311 Wis. 2d 492, 753 N.W.2d 448; *Estate of Sustache v. American Family Mut. Ins. Co.*, 2008 WI 87, 311 Wis. 2d 548, 751 N.W.2d 845. Society argues that if the engine room collapse was the "occurrence," there needs to be another act bringing it about, and the only act is the faulty workmanship. We disagree.

¶ 26. Neither *Stuart* nor *Sustache* support Society's argument. Both cases addressed intentional acts: in *Stuart*, a volitional misrepresentation made to induce another to enter into a contract, 311 Wis. 2d 492, ¶ 40; and in *Sustache*, an assault intended to cause bodily harm, 311 Wis. 2d 548, ¶¶ 52–53. In both cases, the court concluded that these intentional acts did not constitute occurrences within the meaning of the insurance policies because they were not accidents, that is, they did not occur by chance. *Stuart*, 311 Wis. 2d 492, ¶ 45; *Sustache*, 311 Wis. 2d 548, ¶¶ 52–53. Because the court's analysis in both cases focuses on the intentional nature of the alleged conduct, these cases do not provide guidance in this case, where the alleged conduct is negligent work.

¶ 27. Society appears to argue that the court in *Stuart* and *Sustache* employed a definition of "accident" that is more favorable to Society's position than that employed in *American Girl* and *Glendenning's*, which relied on *American Girl*. However, we see nothing in

231

either *Stuart* or *Sustache* indicating that the court was adopting a new definition of "accident" for purposes of determining whether there was an "occurrence" within the meaning of the CGL policy. Indeed, the court in both cases refers to the definition of "accident" in *American Girl* and applies that definition in its analysis. *Stuart*, 311 Wis. 2d 492, ¶ 40; *Sustache*, 311 Wis. 2d 548, ¶¶ 46–47. Thus, rather than establishing a new definition of "accident" that supposedly supports Society's position here, the court in *Stuart* and *Sustache* reaffirmed the definition of "accident" employed in *American Girl*.

B. The Economic Loss Doctrine does not apply.

¶ 28. Society offers an alternative reason for why its CGL policies provide no coverage to its insureds, RS and Flint, for VPP's damage claims. Society's argument may be summarized in the following way. The economic loss doctrine applies to this case because the "predominant purpose" of the construction contract between VPP and RS and Flint was for a *product,* a new wall for a building. And because the economic loss doctrine bars tort claims against subcontractors when the subcontractors supply a portion of a finished product, here the wall, the economic loss doctrine bars VPP's negligence claims in this case. Consequently, according to Society, VPP may sue only for breach of contract. This is significant, in Society's view, because "pure breach of contract claims" are not "occurrences" within the meaning of the CGL policy here, and therefore there is no coverage. We reject this argument.

¶ 29. The court in *American Girl* has explained why Society's argument fails. The economic loss doc-

trine, when it applies, "restrict[s] contracting parties to contract rather than tort remedies for recovery of economic losses associated with the contract relationship." *American Girl*, 268 Wis. 2d 16, ¶ 35. This doctrine is a "remedies principle" and "determines how a loss can be recovered—in tort or in contract/warranty law." *Id.*, ¶ 35. The economic loss doctrine "does not determine whether an insurance policy covers a claim, which depends instead upon the policy language." *Id.* As was the case in *American Girl*, the question here is "not whether [a party] is confined to a contract rather than tort remedy in its claim . . ., but whether [the insurance policy] covers the loss." *See id.*, ¶ 36 n.4.

¶ 30. As did the court in *American Girl*, we will assume without deciding that the economic loss doctrine bars tort recovery here and that VPP's only viable claim is for breach of contract. *See id.*, ¶ 36 & n.4. Society's argument that there is no coverage for this breach of contract claim rests on its assertion that this claim is not an "occurrence" within the meaning of the CGL policy. A similar argument was made and rejected in *American Girl*. *See id.*, ¶¶ 39–49. In addition to explaining why case law did not support this proposition, the court analyzed the policy language:

> [T]here is nothing in the basic coverage language of the current CGL policy to support any definitive tort/ contract line of demarcation for purposes of determining whether a loss is covered by the CGL's initial grant of coverage. "Occurrence" is not defined by reference to the legal category of the claim. The term "tort" does not appear in the CGL policy.

*Id.*, ¶ 41.

¶ 31. Society has pointed to no difference in its policy language that requires a different analysis than that in *American Girl*. Accordingly, we conclude that,

even assuming the economic loss doctrine bars VPP's negligence claim, based on the allegations of the amended complaint, there was property damage caused by an "occurrence" within the meaning of Society's CGL policy.

¶ 32. In sum, we conclude there was an "occurrence" under the CGL policy issued by Society and therefore there is an initial grant of coverage.

II. Neither "business risk" exclusion k.(5) nor k.(6) applies.

¶ 33. Society argues the business risk exclusions k.(5) and k.(6) preclude coverage for property damage to the engine room building. The circuit court did not reach this issue because it ruled there was no "occurrence" and therefore no coverage. Because we have determined that there was an "occurrence" within the meaning of the insurance policy and therefore an initial grant of coverage, we address the business risk exclusions to determine whether they preclude coverage. Because both exclusions share the same issue, what is the meaning of "that particular part," we consider the exclusions together.

¶ 34. The general intent of the "business risk" exclusions is to prevent recovery by an insured-contractor for faulty workmanship. *Kalchthaler*, 224 Wis. 2d at 395. Exclusions k.(5) and k.(6) contain the following language:

**B. Exclusions**

. . . .

This insurance does not apply to:

234

. . . .

### k. Damage To Property

"Property damage" to:

. . . .

**(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

The dispute in this case focuses on what constitutes "[t]hat particular part" of the property on which work was being performed.

¶ 35. Although the business risk exclusions "have generated substantial litigation," *see American Girl*, 268 Wis. 2d 16, ¶ 29, no published case in Wisconsin has specifically interpreted the k.(5) exclusion at issue here, nor has a Wisconsin court construed and applied the phrase "that particular part" as used in both the k.(5) and k.(6) exclusions. The k.(5) exclusion, however, is commonly found in CGL policies written after 1986 and courts from other jurisdictions have construed its precise terms in other policies. We therefore look to two cases from other jurisdictions that have construed these exclusions and the phrase "that particular part" for guidance.

¶ 36. In *Acuity v. Burd & Smith Construction, Inc.*, 721 N.W.2d 33 (N.D. 2006), the insured was a construction company that had contracted with the owners of an existing apartment building to replace the building's roof. *Id.*, ¶ 2. The building owners claimed that during the roof replacement, the insured contractor had failed to protect the building from rainstorms,

235

leading to extensive water damage to the interior of the building, including damage to personal property belonging to two tenants. *Id.* Acuity, the contractor's insurer, commenced an action, seeking a declaration that the insured's CGL policy did not provide coverage for the claimed damages. *Id.*, ¶ 4.

¶ 37. The CGL policy in *Acuity* contained property damage exclusions that are identical to the exclusions at issue in this case, and provided in the policy there as k.(5) and k.(6) exclusions. Citing to a list of cases addressing similar exclusions, the *Acuity* court concluded the exclusions did not bar coverage in that case, and offered the following explanation:

> [O]ther courts have generally construed those property damage exclusions to exclude coverage when the property damage is to the property on which the insured has contracted to perform operations and not to exclude coverage when the property damage is to property that the insured was not performing operations on. Some courts have specifically recognized that facts in each case are determinative of the particular part of property on which an insured is performing its operations and that buildings may be divided into parts in attempting to determine which part or parts are the object of the insured's work product. *A common thread deciding whether there is coverage for property damage is the scope of the insured's contract [with the property owner].*

*Id.*, ¶ 24 (citations omitted and emphasis added). Applying this approach to construing the exclusions in *Acuity*, the court concluded that any "damages to the interior of the apartment building" were not included in that "particular part" and were therefore not excluded under either exclusion k.(5) or k.(6). *Id.*, ¶ 27.

236

¶ 38. In *Fortney & Weygandt, Inc. v. American Manufacturers Mutual Insurance Co.*, 595 F.3d 308, 311 (6th Cir. 2010) (applying Ohio law), the court interpreted the phrase "that particular part" included in a k.(6)-type exclusion:

> The opening words of the exclusion—namely, "[t]hat particular part"—are trebly restrictive, straining to the point of awkwardness to make clear that the exclusion applies only to building parts on which defective work was performed, and not to the building generally. And we also agree that "part," as used in this exclusion, means the "distinct component parts" of a building—things like the "interior drywall, stud framing, electrical wiring," or, as here, the foundation.

¶ 39. One commentator has pointed out that "[t]he use of the word 'particular' suggests that the exclusion only applies to the smallest unit or division of the work in question." Scott C. Turner, Insurance Coverage of Construction Disputes § 32:5 (2011). In the commentator's words, "[t]his coverage approach is often called the 'component parts' approach," and " 'part' as used in this exclusion, means the 'distinct component parts' of a building." *Id.*

¶ 40. We are persuaded that the phrase "that particular part" in the k.(5) and k.(6) exclusions applies only to those parts of a building on which the defective work was performed, which is determined based on the scope of the construction agreement. Our reading of "that particular part" is consistent with the unambiguous language of the policy and cases from other jurisdictions construing similar exclusions in other CGL policies.[2]

---

[2] *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207 (5th Cir. 2009) (policy exclusion did not apply to water damage

¶ 41. We therefore turn to the construction contract between VPP and RS and Flint to determine the scope of the work contracted. The scope of work is set forth in a "Bid Memo" submitted by RS Construction and Flint's Construction, dated May 21, 2006. The bid was for labor to remove and install a 49' x 22' high concrete wall, including shoring and "related work." Dennis Rauscher, the business manager for VPP at the time the work was contracted, avers that the intent of the agreement was to repair the south masonry wall of the masonry block building, sometimes referred to as the "engine room," by removing and replacing the south wall. The work entailed shoring up the building. From this, we conclude the scope of the contracted work was to remove and replace the south wall of the "engine room."

¶ 42. Applying our reading of "that particular part" in the business risk exclusions to the scope-of-work we have identified above, we conclude that the

to inside of individual condominiums caused by inadequate waterproofing of the exterior of the building); *Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365 (5th Cir. 2008) (where contract was to install entertainment center in airplane, damage to other aspects of plane, including loss of use, were not excluded under CGL policy); *Acuity v. Burd & Smith Constr., Inc.*, 721 N.W.2d 33 (N.D. 2006) (contract was for roof replacement only, damage to interior of apartment building from rainstorms was other damage, and not excluded under CGL policy); *American Equity Ins. Co. v. Van Ginhoven*, 788 So.2d 388 (Fla. App. 2001) (where contract was for maintenance and repair of swimming pool, damage to the patio, deck, electrical, plumbing and the residence was not excluded under CGL policy); *William Crawford, Inc. v. Travelers Ins. Co.*, 838 F. Supp. 157 (S.D.N.Y. 1993) (where contract was for renovation of one apartment, fire damage to other portions of apartment building not excluded under CGL policy).

k.(5) exclusion does not apply and that damage to the engine room building and the equipment in that building is covered under the policy.[3]

¶ 43. Society argues that the phrase "that particular part of real property on which you [are] . . . performing operations" is intended to distinguish damage to "the building" on which work is being performed from damage to other buildings that may be on the same real property. Society provides the following example: "VPP had a number of buildings on its property. If the insured had caused a fire, and sparks flew to another building on which the insured was not working, igniting that, the exclusion would not apply." Society's reading of the k.(5) exception is broader than a reasonable reading of the language permits. Its construction of this exclusion is also in conflict with how courts from other jurisdictions have construed "that particular part" in CGL policies with similar exclusions. *See Acuity*, 721 N.W.2d 33, ¶ 24; *Fortney & Weygandt, Inc.*, 595 F.3d at 311; *supra* note 2.

¶ 44. Society argues the phrase "that particular part" applies to the entire engine room building and all equipment located in that building.[4] Society argues this

---

[3] Acuity does not dispute that damage to the work being performed by the contractors—i.e., work on the south wall—is excluded under the business risk exclusions. In other words, there is no coverage under Society's CGL policy for the work contracted between VPP and RS and Flint.

[4] In its appellate brief, Society surveys a number of cases which, in its view, supports its position in this case. Our review of those cases, however, leads us to conclude that none of these cases helps Society: The cases are either distinguishable from this case on their facts or the holdings in the cases actually cut against Society. *See, e.g. , Pekin Ins. Co. v. Willett*, 704 N.E.2d 923 (Ill. App. 1998) (the court specifically noted that the

is so because the contract called for the removal and reconstruction of the entire south wall of the building, which required shoring up the rest of the building as part of the necessary work, and consequently, the contract's "work" included the entire engine room. Society asserts that the k.(5) exclusion applies because the contractors worked in and had control of the entire engine room building, not just one "small area of the footing where Flint was excavating." Thus, Society argues, damages arose out of work being performed as part of the contractor's operations and therefore, exclusion k.(5) applies.

¶ 45. Society's argument rests on the inaccurate assertion that RS and Flint were contracted to work on the entire engine room building, not just the south wall. The Bid Memo did not call for work to be performed on the entire engine room building. The scope of the contracted work was limited to the south wall of the engine room. Society is also wrong in representing that the work entailed shoring up the entire engine room. According to diagrams detailing how the south wall was to be shored-up and photographs taken after the shoring of the wall, it is readily apparent that only the south

contract was for work on the swimming pool, and that there was *no demand for any damages outside of the damage to the pool*); *American Equity Ins. Co. v. Van Ginhoven*, 788 So. 2d 388, 391 (Fla. App. 2001) (contract to conduct repairs and cleaning required draining of swimming pool; damage claim for pool was excluded, however, court found coverage under CGL policy for damages to other property, including the "plumbing, electrical, deck work, patio, screen enclosure or the residence"); *Jet Line Servs., Inc. v. American Emp'rs Ins. Co.*, 537 N.E.2d 107, 109, 111 (Mass. 1989) (contractor's business was to clean large petroleum storage tanks and while cleaning a tank for the U.S. Air Force, the tank exploded; court found the CGL policy exclusions applied because the contract was for cleaning the entire tank).

wall was shored, not the entire engine room. This makes sense because the south wall was the only wall being removed and replaced. Moreover, nothing in the submissions indicates that the south wall supported the concrete slab first floor, or the east and north walls of the engine room. In any event, the defect was the soil erosion caused by faulty excavation and the damages to the second floor, the roof, and the related structures and mechanicals constitutes damage to property other than "that particular part" on which the work was being performed.[5]

¶ 46. Society further argues that, regardless whether exclusion k.(5) applies, exclusion k.(6) bars coverage because the policy excludes coverage for property damage to **"any property** that must be restored, repaired or replaced because 'your work' was incorrectly performed on it," which, in Society's view, includes the entire property the insured was working on and is not limited to the area where the property damage was initiated.

¶ 47. In response, Acuity argues that Society's reading of the k.(6) exclusion is unreasonable because it reads out the words "that particular part" from the exclusion. We agree. We cannot ignore the plain language of the insuring agreement. The exclusion plainly

---

[5] There is another reason why Society's contention that RS and Flint were in control of the entire engine room building is flawed. The "occurrence" was erosion of the soil adjacent to the south wall of the engine room. Thus, even if the contractors were responsible for the entire building and the mechanicals, damage to the building would not be excluded under our reading of both "business risk" exclusions. By way of example, even if the south wall itself collapsed, there would be no coverage for the south wall itself; but damage to other parts of the building, such as a failure of the second floor part of the structure along the south wall line, would be covered.

states that coverage under the policy is excluded for "property damage" to *"[t]hat particular part* of any property that must be restored . . . ."

¶ 48. There is a more fundamental problem with Society's construction of the k.(6) exclusion. In the phrase "any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it," work "performed on *it*" refers back to "any property." Thus, the plain meaning of this language limits application of the exclusion to property that was damaged by "your work" performed on "that particular part" of the building that the contractors were working, which was the south wall of the engine room.

## CONCLUSION

¶ 49. For the reasons stated above, we conclude that there was an "occurrence" within the meaning of the CGL policies issued to RS and Flint, that the economic loss doctrine does not bar coverage and that neither exclusion k.(5) nor k.(6) in the policies apply.[6] We therefore reverse the circuit court's grant of summary judgment in favor of Society, and remand this case for further proceedings.

*By the Court.*—Judgment reversed and cause remanded for further proceedings.

[6] Because we conclude that Society has a duty to potentially indemnify RS and Flint, Society also has a duty to defend them. *See 1325 North Van Buren, LLC v. T-3 Group, Ltd.*, 2006 WI 94, ¶ 66 n.17, 293 Wis. 2d 410, 716 N.W.2d 822.