# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NOS.: | 2019AP1085 & 2019AP1086 |

| | |
|---|---|
| COMPLETE TITLE: | 5 Walworth, LLC,<br>    Plaintiff,<br>  v.<br>Engerman Contracting, Inc.,<br>    Defendant,<br>Downes Swimming Pool Co., Inc. and The<br>Cincinnati Insurance Company,<br>    Defendants-Third-Party Plaintiffs,<br>West Bend Mutual Insurance Company and General<br>Casualty Company of Wisconsin,<br>    Defendants-Petitioners,<br>  v.<br>Otto Jacobs Company, LLC,<br>    Third-Party Defendant-Appellant,<br>Acuity, A Mutual Insurance Company,<br>    Third-Party<br>    Defendant-Respondent-Petitioner.<br><br>5 Walworth, LLC,<br>    Plaintiff,<br>  v.<br>Engerman Contracting, Inc.,<br>    Defendant-Appellant,<br>Downes Swimming Pool Co., Inc. and The<br>Cincinnati Insurance Company,<br>    Defendants-Third-Party Plaintiffs,<br>West Bend Mutual Insurance Company and General<br>Casualty Company of Wisconsin,<br>    Defendants-Respondents-Petitioners,<br>  v.<br>Otto Jacobs Company, LLC,<br>    Third-Party Defendant,<br>Acuity, A Mutual Insurance Company,<br>    Third-Party Defendant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 399 Wis. 2d 240, 963 N.W.2d 779
PDC No: 2021 WI App 51 - Published

| | |
|---|---|
| OPINION FILED: | June 20, 2023 |
| SUBMITTED ON BRIEFS: | |

ORAL ARGUMENT:        September 12, 2022

SOURCE OF APPEAL:
  COURT:        Circuit
  COUNTY:       Walworth
  JUDGE:        Daniel Steven Johnson

JUSTICES:
HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined, and in which ZIEGLER, C.J., joined except for ¶¶5, 7, 39-42, and 49. ROGGENSACK, filed a concurring opinion. ZIEGLER, C.J., filed an opinion concurring in part and dissenting in part, in which REBECCA GRASSL BRADLEY, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For defendants-petitioners and defendants-respondents-petitioners, there were briefs filed by *Henry E. Koltz, Robert F. Johnson, Douglas M. Raines,* and *Schmidt, Darling & Erwin,* Milwaukee, and *von Briesen & Roper, S.C.,* Milwaukee. There was an oral argument by *Henry E. Koltz*.

For third-party defendant-respondent-petitioner and third-party defendant-petitioner, there were briefs filed by *Joseph M. Mirabella* and *Simpson & Deardorff, S.C.* There was an oral argument by *Joseph M. Mirabella*.

For third-party defendant-appellant and third-party defendant, there was a brief filed by *Sheila L. Shadman Emerson, Scott R. Halloin,* and *Halloin Law Group, S.C.,* Milwaukee. There was an oral argument by *Sheila L. Shadman Emerson*.

For defendant and defendant-appellant, there was a brief filed by *Thomas G. Gardiner* and *Gardiner, Koch, Weisberg &*

*Wrona,* Lake Geneva. There was an oral argument by *Michelle LaGrota* and *Douglas M. Raines*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

Nos. 2019AP1085 & 2019AP1086
(L.C. No. 2018CV319)

STATE OF WISCONSIN     :     IN SUPREME COURT

**5 Walworth, LLC,**

       **Plaintiff,**

      **v.**

**Engerman Contracting, Inc.,**

       **Defendant,**

**Downes Swimming Pool Co., Inc. and The Cincinnati Insurance Company,**

       **Defendants-Third-Party Plaintiffs,**

**West Bend Mutual Insurance Company and General Casualty Company of Wisconsin,**

       **Defendants-Petitioners,**

      **v.**

**Otto Jacobs Company, LLC,**

       **Third-Party Defendant-Appellant,**

**Acuity, A Mutual Insurance Company,**

       **Third-Party Defendant-Respondent-Petitioner.**

**FILED**

**JUN 20, 2023**

Sheila T. Reiff
Clerk of Supreme Court

---

**5 Walworth, LLC,**

       **Plaintiff,**

      **v.**

Engerman Contracting, Inc.,

      Defendant-Appellant,

Downes Swimming Pool Co., Inc. and The
Cincinnati Insurance Company,

      Defendants-Third-Party Plaintiffs,

West Bend Mutual Insurance Company and General
Casualty Company of Wisconsin,

      Defendants-Respondents-Petitioners,

    v.

Otto Jacobs Company, LLC,

      Third-Party Defendant,

Acuity, A Mutual Insurance Company,

      Third-Party Defendant-Petitioner.

---

HAGEDORN, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and KAROFSKY, JJ., joined, and in which ZIEGLER, C.J., joined except for ¶¶5, 7, 39-42, and 49. ROGGENSACK, filed a concurring opinion. ZIEGLER, C.J., filed an opinion concurring in part and dissenting in part, in which REBECCA GRASSL BRADLEY, J., joined.

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*


¶1 BRIAN HAGEDORN, J. This is an insurance dispute over damages allegedly caused by the deficient construction of an in-ground pool. The pool cracked and caused vast amounts of water to leak into the surrounding soil. In the end, the homeowner

had to demolish the entire pool structure and construct a new one. Two of the insurers in this case issued commercial general liability (CGL) polices to the general contractor, and the other issued a CGL policy to the supplier of the shotcrete pump mix used to construct the pool. In this suit by the homeowner, all three insurers seek summary judgement declaring that their policies do not provide coverage to their insureds.

¶2 A threshold question in this case concerns how to analyze whether there has been "property damage" caused by an "occurrence" under the three CGL policies. The argument centers around our decision in Wisconsin Pharmacal Co., LLC v. Nebraska Cultures of California, Inc., where we stated that "property damage" under a CGL policy requires damage to "other property" and utilized the "integrated systems analysis"——a test derived from tort law——to assess whether other property was damaged. 2016 WI 14, ¶28, 367 Wis. 2d 221, 876 N.W.2d 72. At a basic level, the integrated systems analysis asks whether the product is part of an integrated whole such that any damage can be ascribed only to the product itself, rather than to other property. Wausau Tile, Inc. v. Cnty. Concrete Corp., 226 Wis. 2d 235, 249-50, 593 N.W.2d 445 (1999). The insurers here argue we must first undertake this analysis to determine whether any "property damage" occurred for purposes of determining an initial grant of coverage under their policies.

¶3 We do not see it the same way. With the benefit of hindsight, we conclude our approach in Pharmacal was a departure from our well-established law. The decision flatly contradicted

2

prior cases without addressing those conflicts head on. See, e.g., Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, ¶¶6, 24, 35, 268 Wis. 2d 16, 673 N.W.2d 65. Pharmacal wrongly stated that "property damage" must be to "other property" for purposes of determining an initial grant of coverage in a CGL policy. It then improperly imported the integrated systems analysis to determine if "other property" was damaged. Accordingly, we overrule these portions of Pharmacal, and affirm, as we have repeatedly said, that our task in insurance coverage disputes is to read the policy and give effect to the parties' agreement. Therefore, we return to that contract-focused analysis here.

¶4 General Casualty Company of Wisconsin, the insurer for general contractor Engerman Contracting, Inc., contends that its policy does not provide an initial grant of coverage because the issues related to the pool did not constitute "property damage" caused by an "occurrence" as those terms are defined in the policy. We disagree. Reviewing the record before us on summary judgment, we conclude that a trier of fact could conclude that the water leakage and consequent cracks in the pool and damage to the surrounding soil constituted property damage caused by an occurrence. Accordingly, General Casualty is not entitled to summary judgment.

¶5 West Bend Mutual Insurance Company, which also insures Engerman, asserts that its policy does not provide an initial grant of coverage for two reasons. First, it likewise contends there was no "property damage" caused by an "occurrence" under its policy. In this regard, West Bend's policy is materially

3

identical to General Casualty's policy, and West Bend is not entitled to summary judgment on this argument for the same reasons. Alternatively, West Bend claims Engerman knew that the property damage occurred before the policy period began and therefore the policy does not provide coverage. We disagree. The record before us does not conclusively establish that the property damage here was a continuation, change, or resumption of the damage Engerman knew about before the policy began. Therefore, West Bend is not entitled to summary judgment.

¶6    Finally, Acuity, A Mutual Insurance Company is the insurer for Otto Jacobs Company, the entity that provided the shotcrete used to construct the floor and walls of the pool. Acuity argues that its policy does not provide an initial grant of coverage and that, even if there is an initial grant of coverage, the "your product" exclusion precludes coverage. We see it differently. Acuity's policy likewise provides coverage when "property damage" is caused by an "occurrence." If Otto Jacobs supplied defective shotcrete, a trier of fact could determine that it caused the water leakage——an occurrence——and damaged the surrounding soil and pool structure. Moreover, a trier of fact could conclude based on this record that the "your product" exclusion in Acuity's policy does not apply here when the property damage is to the surrounding soil and pool complex——more than just Otto Jacobs' product or arising from the product. Therefore, Acuity is not entitled to summary judgment.

4

¶7    Accordingly, we affirm the decision of the court of appeals and remand back to the circuit court for further proceedings.

I. BACKGROUND

¶8    5 Walworth LLC owns lakeshore property in Lake Geneva and hired Engerman to serve as the general contractor for construction of an in-ground swimming pool complex. Engerman subcontracted with Downes Swimming Pool Co., Inc. to construct the pool complex, which included both a main pool and a children's pool. Otto Jacobs supplied Downes with a ready-mixed concrete called shotcrete commonly used in swimming pool construction. Construction began in June 2012 and finished that August.

¶9    Shortly after the contractors finished the project, 5 Walworth noticed a leak in the main pool and in the children's pool. The leaking persisted in the summers of 2013, 2014, and 2015, with Downes attempting to repair the leaks each year. In 2015, 5 Walworth commissioned a report from engineering firm Wiss, Janney, Elstner Associates, Inc. (WJE). WJE's final report, which is part of the summary judgment record, concluded that the pool walls cracked because of less than optimal installation, moist conditions due to significant water leakage, and the placement of steel reinforcing bars. It determined that the cracking would continue, with either new cracks forming or existing cracks worsening. While the report took samples from the main pool, WJE concluded that the children's pool faced the

5

same probable cause of cracking. The report also mentioned the findings of soil reports from neighboring properties which indicated that water existed at levels above the normal water table. The report recommended removing unsuitable soils from one of the neighboring properties. Ultimately, 5 Walworth hired a new contractor to demolish the old pool and construct a new one, which was completed in October 2017.

¶10 In 2018, six years after the initial construction, 5 Walworth sought damages for demolition of the old pool and construction of a new one. It brought a complaint against subcontractor Downes and its insurer, and against general contractor Engerman and its insurers——West Bend and General Casualty. The complaint alleged negligence against Downes, and breach of contract, breach of implied warranty of merchantability and fitness, negligence, and violation of Wis. Stat. § 100.18(1) (2021-22) against Engerman.[1] Downes filed a third-party complaint against shotcrete provider Otto Jacobs and its insurer Acuity, alleging Otto Jacobs was negligent in providing Downes inferior shotcrete.[2] Engerman and West Bend then brought a cross-claim against Downes (and its insurer) and Otto Jacobs for contribution and/or indemnification.

---

[1] On appeal, Engerman does not challenge the circuit court's ruling that there was no coverage arising out of 5 Walworth's Wis. Stat. § 100.18 claim. Accordingly, we do not address this.

All subsequent references to the Wisconsin Statutes are to the 2021-22 version.

[2] Downes did not originally name Acuity in this complaint; Acuity intervened.

6

¶11 General Casualty, West Bend, and Acuity tendered a defense of their respective insureds. They all moved to bifurcate and litigate coverage. Each moved for summary judgment and requested declarations that they did not have a duty to indemnify or further defend under their policies. With respect to General Casualty and West Bend's motions, the circuit court[3] concluded that there was no property damage caused by an occurrence—only faulty workmanship—and therefore the insurers owed no coverage. And when analyzing Acuity's motion against shotcrete provider Otto Jacobs, the court applied the integrated systems analysis we utilized in Pharmacal to conclude there was no property damage caused by an occurrence and therefore no coverage. Accordingly, the circuit court granted all three motions for summary judgment and dismissed the three insurers from the action.

¶12 The two insureds, Engerman and Otto Jacobs, appealed the grant of summary judgment against them. The court of appeals consolidated the appeals and reversed. 5 Walworth, LLC v. Engerman Contracting, Inc., 2021 WI App 51, 399 Wis. 2d 240, 963 N.W.2d 779. All three insurers then filed separate petitions for review which we granted.

---

[3] The Honorable Daniel S. Johnson of the Walworth County Circuit Court presided.

7

II.  ANALYSIS

¶13  This case comes before us on motions for summary judgment by the insurers seeking a declaration that their policies do not provide coverage to their insureds.  All three insurers tendered a defense, so we are analyzing if they are entitled to summary judgment on the question of coverage based on the full record, not just the complaint.  See Est. of Sustache v. Am. Fam. Mut. Ins. Co., 2008 WI 87, ¶29, 311 Wis. 2d 548, 751 N.W.2d 845.  "Summary judgment is appropriate when there is no genuine issue of material fact and 'the moving party is entitled to judgment as a matter of law.'"  Quick Charge Kiosk LLC v. Kaul, 2020 WI 54, ¶9, 392 Wis. 2d 35, 944 N.W.2d 598 (quoting Wis. Stat. § 802.08(2)).  We review motions for summary judgment independently, without deference to the lower courts.  Id.  The legal issues in this case require us to interpret the terms of three insurance contracts.  This also presents questions of law we review independently.  Am. Girl, 268 Wis. 2d 16, ¶23.

¶14  We begin our analysis by clearing up confusion engendered by our decision in Pharmacal regarding how to analyze whether a CGL policy provides an initial grant of coverage.  We then apply the proper framework to this case based on the facts presented in the summary judgment record, examining the three policies in turn.

8

### A. Pharmacal

¶15 Before we explain Pharmacal's errors, we begin by outlining our standard approach to these kinds of cases. CGL policies, like those here, are a particular type of insurance contract that protect "the insured against liability for damages the insured's negligence causes to third parties." Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 2000 WI 26, ¶27, 233 Wis. 2d 314, 607 N.W.2d 276. This kind of policy is designed to insure against "the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable." Id. (quoting another source).

¶16 When analyzing whether an insurance policy provides coverage, we examine the terms of the policy and compare it to the facts in the record. See, e.g., Am. Girl, 268 Wis. 2d 16, ¶32 ("[W]hether the insuring agreement confers coverage depends upon whether there has been 'property damage' resulting from an 'occurrence' within the meaning of the CGL policy language.").[4]

---

[4] See also Day v. Allstate Indem. Co., 2011 WI 24, ¶36, 332 Wis. 2d 571, 798 N.W.2d 199 (noting that a claim fell within a policy's initial grant of coverage because there was bodily injury); Everson v. Lorenz, 2005 WI 51, ¶27, 280 Wis. 2d 1, 695 N.W.2d 298 (explaining that the complaint did not allege property damage and therefore did not trigger insurance coverage); Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 2000 WI 26, ¶¶28-32, 233 Wis. 2d 314, 607 N.W.2d 276 (concluding the facts in the record did not satisfy the policy definition of property damage); Acuity v. Soc'y Ins., 2012 WI App 13, ¶15, 339 Wis. 2d 217, 810 N.W.2d 812 (stating "[w]e begin with the policy language and then examine the factual pleadings to determine whether there is an initial grant of coverage."); United Co-op.

We conduct this analysis in three stages. Id., ¶24. First, we determine if the policy "makes an initial grant of coverage." Id. If so, we "examine the various exclusions to see whether any of them preclude coverage." Id. Finally, should any exclusion apply, we "look to see whether any exception to that exclusion reinstates coverage." Id.

¶17 In American Girl, this court was faced with several issues germane to the issues before us today. By way of background, American Girl involved "a construction project gone awry." Id., ¶3. A soil engineer had given faulty advice to the general contractor, leading to problematic soil settlement underneath the completed warehouse. Id. This then damaged the building's foundation, which eventually led to the building being declared unsafe and torn down. Id., ¶¶3, 5.

¶18 The CGL insurer in that case argued that the economic loss doctrine should bar coverage under the CGL policy. Id., ¶34. Not so, we concluded. Id., ¶¶34-36. "The economic loss doctrine operates to restrict contracting parties to contract rather than tort remedies for recovery of economic losses associated with the contract relationship." Id., ¶35. It is a remedies principle applicable in tort cases, and "does not determine whether an insurance policy covers a claim, which depends instead upon the policy language." Id. Thus, while the economic loss doctrine may preclude recovery in tort, it should

v. Frontier FS Co-op., 2007 WI App 197, ¶13, 304 Wis. 2d 750, 738 N.W.2d 578 (indicating that the record established an occurrence as that term is defined in the policy).

not be used to ascertain if a CGL policy—a contract—provides coverage. Id., ¶36.

¶19 Turning then to the contract language, we examined whether there was an initial grant of coverage, which (as is the case here) required an inquiry into whether an "occurrence," defined as an "accident," caused "property damage." Id., ¶37. The insurer argued that the defective work could not constitute an "occurrence" because CGL policies are not meant to cover an insured's defective work or product. Id., ¶39. That general principle is correct, we explained, but not because it is not an "occurrence" under the policy. Id. Rather, the reason an insured's defective work or product is generally not covered by a CGL policy is due to the business risk exclusions in the CGL policy. Id. This exclusions analysis only comes into play in the second stage after a determination of an initial grant of coverage—that an "occurrence" caused "property damage." Id., ¶47. As such, the insurer incorrectly tried to incorporate the exclusions analysis into the initial coverage determination. Id.

¶20 After clarifying these issues, we concluded there was an accident, i.e., an occurrence, which caused property damage, thus providing an initial grant of coverage. Id., ¶49. We then considered the exclusions—step two of the analysis—along with other issues in the case, the details of which are unnecessary here. Id., ¶¶50-86. With this background in place, we turn to Pharmacal.

11

¶21 In Pharmacal, the supplier of a supplement tablet sued two companies that provided an improper species of bacteria. Pharmacal, 367 Wis. 2d 221, ¶¶4-7. The incorrect bacteria was blended with the other ingredients of the supplement and compressed into tablet form; none of the ingredients could be separated. Id., ¶5. We then considered whether there was "property damage" caused by an "occurrence" under the terms of the CGL policies for the insurers of the companies that supplied the wrong bacteria. Id., ¶¶8-9, 23. Our analysis went wayward in two respects.

¶22 First, in conducting the initial grant of coverage analysis, Pharmacal reasoned that to constitute "property damage" under the CGL policy, the damage must be to "other property." Id., ¶¶24-27. The policy language in Pharmacal, however, made no mention of an "other property" requirement. Like the three policies at issue here, property damage was defined as, "Physical injury to tangible property, including all resulting loss of use of that property." Id., ¶23.

¶23 Rather than relying on the language in the CGL policy, Pharmacal supported this "other property" requirement by citing two prior opinions: Wisconsin Label Corp., 233 Wis. 2d 314 and Vogel v. Russo, 2000 WI 85, 236 Wis. 2d 504, 613 N.W.2d 177. Both were discussed in American Girl, however, and neither contains such a requirement as part of the initial grant of coverage analysis. The portions cited in Pharmacal were not in the initial grant of coverage discussions; they were general comments on the purpose of a CGL policy. See Wis. Label Corp.,

12

233 Wis. 2d 314, ¶27; Vogel, 236 Wis. 2d 504, ¶17. The cited language simply explains that the risk insured in a CGL policy includes "damage to property other than to the product or completed work itself." Wis. Label Corp., 233 Wis. 2d 314, ¶27 (quoting another source). But as American Girl explains in depth, this is true because of the business risk exclusions, not the initial coverage determination. See 268 Wis. 2d 16, ¶¶39, 43 (discussing Vogel, 236 Wis. 2d 504). In effect, then, Pharmacal incorporated an "other property" analysis that may be relevant to the policy's business exclusions (stage two) into the determination of whether an "occurrence" caused "property damage" (stage one). See 367 Wis. 2d 221, ¶¶24-27.

¶24 Pharmacal's second error stems from its first. Because the court thought it must analyze whether there was damage to "other property" when analyzing whether "property damage" occurred, Pharmacal enlisted the assistance of the integrated systems analysis. Id., ¶27-28. By way of background, for a tort claim to survive the economic loss doctrine, the damage alleged must be to other property—something other than a loss to the defective product itself. Wausau Tile, 226 Wis. 2d at 247-48. The integrated systems analysis is used to ascertain whether damage to a defective component of an integrated system constitutes damage to other property. Id. at 249. In Wausau Tile, we embraced the integrated system analysis from the Restatement (Third) of Torts, which states in part:

13

> What constitutes harm to other property rather than harm to the product itself may be difficult to determine. A product that nondangerously fails to function due to a product defect has clearly caused harm only to itself. A product that fails to function and causes harm to surrounding property has clearly caused harm to other property. However, when a component part of a machine or a system destroys the rest of the machine or system, the characterization process becomes more difficult. <u>When the product or system is deemed to be an integrated whole, courts treat such damage as harm to the product itself.</u>

<u>Id.</u> at 249 (quoting Restatement (Third) of Torts § 21 cmt. e (1997)). Again, the purpose of this test is to ascertain if a party may pursue tort remedies, or whether the economic loss doctrine bars them, leaving the plaintiff to pursue only contract remedies.

¶25 So rather than focus its analysis on the policy language, <u>Pharmacal</u> took this integrated systems analysis from tort law and held that such an analysis is "necessary when evaluating coverage under a CGL policy." 367 Wis. 2d 221, ¶28. <u>Pharmacal</u> painted with a broad brush and seemed to incorporate the integrated systems analysis into all determinations of whether "property damage" has occurred under the terms of a CGL policy. <u>See</u> <u>id.</u>

¶26 This move was problematic for several reasons. As we've noted, it runs headlong into the fundamental principle running through our insurance cases that policy interpretation should focus on the language of the insurance policy. <u>See,</u> <u>e.g.</u>, <u>Am. Girl</u>, 268 Wis. 2d 16, ¶¶6, 32, 35; <u>supra</u> ¶16 n.4. And relatedly, this broad directive flatly contradicts our holding in <u>American Girl</u> that we resolve whether an insurance policy

14

covers a claim based on the policy language and without resort to tort principles such as the economic loss doctrine, and by implication, the integrated systems analysis used to assess its application. <u>Compare</u> <u>Am. Girl</u>, 268 Wis. 2d 16, ¶¶6, 34-35 <u>with</u> <u>Pharmacal</u>, 367 Wis. 2d 221, ¶¶28, 34-35.

¶27 This is important because economic loss doctrine principles are aimed at keeping tort law and contract law separate. Once again, the "economic loss doctrine generally operates to confine contracting parties to contract rather than tort remedies for recovery of purely economic losses associated with the contract relationship." <u>Am. Girl</u>, 268 Wis. 2d 16, ¶6. The economic loss doctrine maintains "the fundamental distinction between tort law and contract law." <u>Hinrichs v. DOW Chemical Co.</u>, 2020 WI 2, ¶29, 389 Wis. 2d 669, 937 N.W.2d 37 (quoting another source). By keeping these purely economic losses in the realm of contract, commercial parties are free to assess the economic risks and contract accordingly. <u>Id.</u> The commercial purchaser is empowered to "assume, allocate, or insure against that risk." <u>Id.</u> (quoting another source).

¶28 This is why we made clear in <u>American Girl</u> that the economic loss doctrine should not be used to ascertain if a CGL policy (a contract) provides coverage. We followed the same approach in <u>Wausau Tile</u>, where even though the tort claims were barred by the economic loss doctrine, that conclusion was separate from whether the insurer had a duty to defend based on the language of the insurance policy. 226 Wis. 2d at 259, 265-68.

15

¶29 In addition, Pharmacal's conclusion was an outlier, and raises further doctrinal anomalies. As the Seventh Circuit recognized in Haley v. Kolbe & Kolbe Millwork Co., "[t]he economic-loss doctrine generally does not apply to insurance-coverage disputes." 866 F.3d 824, 828 (7th Cir. 2017). Yet it recognized that we did exactly that in Pharmacal, while at the same time affirming our traditional focus on the policy language in other parts of the opinion. Id. at 828-29. In the end, the Seventh Circuit seemingly concluded that Pharmacal was not as broad as its language suggests, and determined the integrated-systems analysis was not appropriate in an insurance dispute where the underlying claim concerned leaky windows. Id. The court of appeals in the decision we are reviewing similarly struggled with how to square Pharmacal's adoption of the integrated systems analysis with our standard approach of applying the facts to the terms of the policy. 5 Walworth, LLC, 399 Wis. 2d 240, ¶37. It could not be, the court of appeals reasoned, that Pharmacal should be read "as importing language that does not exist into a policy." Id.

¶30 In this case, the insurers ask us to enforce what we said in Pharmacal——that the integrated systems analysis is "necessary when evaluating coverage under a CGL policy." 367 Wis. 2d 221, ¶28. The insureds, on the other hand, do not ask us to overrule Pharmacal. They instead ask that we limit its application——much like the Seventh Circuit did in Haley and the court of appeals did below. But while Haley and the court of appeals made admirable attempts to reconcile our conflicting

16

statements, this case illustrates inconsistencies that cannot be remedied by affirming both approaches. We are reluctant to reject the holding of a case so recently decided, and to do so without being asked by the parties. But as we see it, this case forces us to choose whether to remain consistent with our prior cases, or follow the new course charted by Pharmacal. In the end, we conclude we must bring consistency and clarity to this area of law that is now muddled by Pharmacal's missteps.

¶31 Therefore, we overrule Pharmacal's holding incorporating the integrated systems analysis into insurance policy disputes. We further reject and overrule its incorporation of an "other property" analysis into the initial determination of whether an occurrence has caused "property damage" under an insurance policy.[5] The proper approach is the one we laid out in American Girl and multiple other cases: our task is to interpret and apply the language of the insurance policy. In doing so, we follow the three-step process we outlined above. We first examine if the policy makes an initial grant of coverage, then analyze if any exclusions preclude coverage, and finally, review if any exceptions to a particular exclusion reinstate coverage. Am. Girl, 268 Wis. 2d 16, ¶24.

---

[5] While we overrule Pharmacal's improper incorporation of the integrated systems analysis into all CGL claims and its errant focus on damage to "other property" when analyzing if there is "property damage," we do not address the decision's analysis on other matters.

¶32 These clarifications in place, we turn to the arguments by each of the three insurers that their policies do not provide coverage and they are entitled to summary judgment.

## B. General Casualty's Policy

¶33 General Casualty issued a CGL policy to Engerman, the general contractor. Engerman faces claims arising out of its allegedly faulty installation and construction of the pool. General Casualty moved for summary judgment and contends that its policy does not provide an initial grant of coverage to Engerman because "property damage" was not caused by an "occurrence."

¶34 General Casualty's policy provides that coverage is triggered by "property damage" if the "'property damage' is caused by an 'occurrence.'" "Property damage" and "occurrence" are both defined terms in the policy. "Property damage," as relevant here, means "[p]hysical injury to tangible property, including all resulting loss of use of that property." And "'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Accident" is not a defined term in the policy, but Wisconsin courts have interpreted identical policy language many times. Generally, an "accident" is "an event or condition occurring by chance or arising from unknown or remote causes," or "an event which takes place without one's foresight or expectation." Am. Girl, 268 Wis. 2d 16, ¶37 (quoting Webster's

18

Third New Int'l Dictionary of the English Language 11 (2002); Black's Law Dictionary 15 (7th ed. 1999)).

¶35 When we compare these policy terms to the record, we conclude a jury could find that property damage caused by an occurrence existed. We observe and reiterate the basic principle "that while faulty workmanship is not an 'occurrence,' faulty workmanship may cause an 'occurrence.'" Acuity v. Soc'y Ins., 2012 WI App 13, ¶24, 339 Wis. 2d 217, 810 N.W.2d 812. For example, we held in American Girl that faulty workmanship caused soil to settle. 268 Wis. 2d 16, ¶5. The settling was an accident, and therefore an occurrence, that caused property damage. Id. The court of appeals reasoned similarly in a case where faulty work by a subcontractor resulted in leaking windows. Kalchthaler v. Keller Constr. Co., 224 Wis. 2d 387, 391-92, 591 N.W.2d 169 (Ct. App. 1999). The court of appeals explained that an initial grant of coverage was present because the window leaking was an accident, and thus an occurrence, that caused property damage. Id. at 397. The court of appeals again utilized the same approach in a case where faulty excavation techniques (faulty workmanship) accidentally caused soil erosion (an occurrence) which led part of a building to collapse (property damage). Acuity, 339 Wis. 2d 217, ¶17. The lesson from our case law examining similar policy language is this: faulty workmanship is not an occurrence, but faulty workmanship can lead to an occurrence that causes property damage.

¶36 Turning to the summary judgment record, the WJE report concluded that cracks in the main pool occurred, and therefore

19

water leaked into the surrounding soil. This was the result, according to the report, of less-than-optimal installation of the shotcrete and poor placement of steel reinforcing bars, among other reasons. The improper installation of the shotcrete and the incorrect placement of the steel reinforcing bars are not enough on their own to constitute an occurrence; if proven, that is faulty workmanship. But the record can support a conclusion that this faulty work caused the pool to crack and leak, and those cracks became worse as the pool leaked and destabilized the surrounding soil. The cracks, leakage, and soil damage could constitute accidents——unexpected and unforeseen events——caused by improper installation. And these cracks and the damage to the surrounding soil also could constitute physical injuries to the homeowner's tangible property——i.e., property damage as defined by the policy.[6] In the end, 5 Walworth claims the whole pool complex was compromised and needed to be rebuilt. Therefore, a trier of fact could conclude that General Casualty's policy provides an initial grant of coverage because there is property damage caused by an occurrence as those terms are defined in the policy. As such, General Casualty is not entitled to summary

---

[6] The WJE report states that while the cracks were initially caused by less-than-optimal installation of the shotcrete and poor placement of the steel reinforcing bars, among other reasons, they continued to worsen in part due to the destabilization of the soil. Thus, while the cracks were initially an occurrence, their continued growth——caused at least in part by the water in the surrounding soil——could constitute property damage.

judgment. And because it does not argue at this stage that any of its policy's exclusions preclude coverage, we end our inquiry here.

## C. West Bend's Policy

¶37 West Bend also issued a CGL policy to Engerman. It asserts the policy does not provide an initial grant of coverage for two reasons: (1) there was no "property damage" caused by an "occurrence" and (2) Engerman knew about the property damage before the policy issued.

¶38 With respect to the first argument, West Bend's policy language granting coverage when "property damage" is caused by an "occurrence" is identical to General Casualty's policy. Furthermore, both policies were issued to the same insured (Engerman) defending against the same claims; West Bend's policy applies to the facts in the same way. Therefore, for the reasons explained above, a factfinder could conclude based on the facts in this summary judgment record that "property damage" was caused by an "occurrence." West Bend is not entitled to summary judgment on this argument.

¶39 West Bend's second argument fares no better. West Bend's policy only insures "property damage" that "occurs during the policy period." The policy provides that if an insured or authorized employee "knew, prior to the policy period, that the . . . 'property damage' occurred, then any continuation, change or resumption of such . . . 'property damage' during or after the policy period will be deemed to have been known prior

21

to the policy period." So, if Engerman knew of the property damage before the policy issued, West Bend's policy does not provide coverage.

¶40 West Bend's first policy issued to Engerman commenced on October 27, 2013. But West Bend argues Engerman knew of the property damage well before then. After the pool complex was completed in August 2012, 5 Walworth noticed a leak almost immediately. John Engerman, the President and CEO of Engerman and an insured under West Bend's policy, sent and received emails in August of 2012 that indicate he visited the pool complex and noted that subcontractor Downes replaced the stonework that was near the children's pool——the believed source of the leak. The leak persisted into May of 2013, and Downes investigated the issue the next month. Emails in June of 2013, that John Engerman was copied on in August 2013, reveal that Engerman knew the pool complex, and the children's pool in particular, was still leaking. These emails state that, "The auto fill is running 24/7 and cannot keep up with the leak" and that, "Clearly it is a LEAK." West Bend contends these facts clearly show that Engerman knew about the property damage at issue in this case before its policy began.

¶41 Engerman interprets the record differently. It contends this issue should be remanded because John Engerman testified in his deposition that he believed the leaking in both 2012 and 2013 referred to waterproofing issues with the stonework near the children's pool——not the property damage at issue here. Engerman further maintains the record is

22

insufficient on whether the leaking that occurred in 2012 and 2013 gave rise to the property damage at issue in this case.

¶42 We conclude the record is insufficient for us to determine, as a matter of law, that Engerman knew about the property damage alleged here prior to the commencement of its policy with West Bend. West Bend's argument relies on the inference that the property damage in this case was a "continuation, change or resumption" of the damage Engerman knew about in 2012 and 2013. But the record does not conclusively establish this link. The WJE report does not connect the damage Engerman knew of in 2012 and 2013 to the later cracks in the pool and damage to the surrounding soil. And John Engerman testified that he did not know of these specific problems until 2016. On summary judgment, we draw reasonable inferences in the light most favorable to the non-moving party. Burbank Grease Servs., LLC v. Sokolowski, 2006 WI 103, ¶40, 294 Wis. 2d 274, 717 N.W.2d 781. Here, that's Engerman. So, while West Bend's arguments might win the day before a jury, West Bend is not entitled to summary judgment on the theory that its policy does not provide an initial grant of coverage.[7]

### D. Acuity's Policy

¶43 Acuity issued a CGL policy to Otto Jacobs, the shotcrete supplier. According to the third-party complaint,

---

[7] West Bend does not argue at this stage that any of the policy's exclusions preclude coverage. Its two arguments are focused solely on the initial grant of coverage.

23

Otto Jacobs negligently provided subcontractor Downes with inferior shotcrete to construct the pool. Acuity argues that its policy does not provide an initial grant of coverage because there was no "property damage" caused by an "occurrence." And even if it does, Acuity asserts the policy's "your product" exclusion precludes coverage. Neither argument prevails at this stage and on this record.

¶44 Acuity's policy, like those of General Casualty and West Bend, provides an initial grant of coverage when "<u>property damage</u>" "is caused by an <u>occurrence</u>." And it has identical definitions of "property damage" and "occurrence" to those previously discussed. The analysis is slightly different under this policy, however, because of the nature of the claim against Otto Jacobs. Namely, the allegation is that the product supplied by Otto Jacobs for use in the construction project——the shotcrete——was defective.

¶45 Acuity's arguments seeking summary judgment largely ask us to see the allegedly defective shotcrete as part of an integrated system, the pool complex. We decline to do so. Rather, the proper analysis based on the language of the policy is whether the defective shotcrete (assuming this is proven) led to an accident, which then caused property damage. As we have discussed, the water leakage, among other things, is sufficient to constitute an accident. And this led to cracking in the pool, further leakage, damage to the surrounding soil, and eventually, replacement of the entire pool complex. If the shotcrete was defective, a jury could find that it led to an

24

accident (water leakage at the very least) that caused property damage. Therefore, at this stage of the proceedings, Acuity's policy does not preclude an initial grant of coverage to Otto Jacobs.

¶46 That leads us to Acuity's alternative argument that its "your product" exclusion precludes coverage. This exclusion bars coverage to "Property damage to your product arising out of it or any part of it." We already addressed the definition of "property damage" above. And relevant here, "'Your product' means: a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by: (1) You."

¶47 Here, Otto Jacobs' product is the shotcrete. Acuity argues that the "your product" exclusion applies because of damage to the shotcrete, and damages necessarily incurred to repair or replace the allegedly defective shotcrete. However, the record does not clearly establish this as a matter of undisputed fact; significant evidence cuts the other way. The WJE report stated the cracks in the shotcrete arose not from a deficiency in Otto Jacob's product, but from installation errors (by a different company with a different insurer), moist conditions in the soil, and placement of the steel reinforcing bars. Therefore, Acuity is not entitled to summary judgment on the theory that its "your product" exclusion bars coverage.

25

III. CONCLUSION

¶48 Resolution of the parties' dispute requires us to overrule portions of our decision in Pharmacal. The main takeaway is this: When analyzing if there is "property damage" under a CGL policy in the initial grant of coverage stage, we do not employ the integrated systems analysis nor do we limit our review of property damage to damage to "other property." We apply the terms of the policy.

¶49 Doing so here, we affirm the decision of the court of appeals. With respect to General Casualty's policy, we conclude it is not entitled to summary judgment because a trier of fact could conclude there is "property damage" caused by an "occurrence" as those terms are defined in its policy. For the same reasons, West Bend is not entitled to summary judgment on its argument there is no "property damage" caused by an "occurrence." And West Bend is also not entitled to summary judgment on its argument that Engerman knew of the property damage prior to the commencement of West Bend's policy because the record does not sufficiently establish that the property damage here was a continuation, change, or resumption of the damage Engerman knew about before the policy began. Finally, we conclude that Acuity is not entitled to summary judgment on either of its arguments. A trier of fact could conclude that there was "property damage" caused by an "occurrence" and that the property damage is to more than just Otto Jacobs' product or arising from the product.

26

*By the Court.*—The decision of the court of appeals is affirmed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶50 PATIENCE DRAKE ROGGENSACK, J. *(concurring).* The majority opinion appears not to understand the judicial history of the commercial law doctrines that underlie Wis. Pharmacal Co., LLC v. Neb. Cultures of Cal., Inc., 2016 WI 14, 367 Wis. 2d 221, 876 N.W.2d 72, Wausau Tile, Inc. v. Cnty. Concrete Corp., 226 Wis. 2d 235, 593 N.W.2d 445 (1999), Vogel v. Russo, 2000 WI 85, 236 Wis. 2d 504, 613 N.W.2d 177, Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc., 2004 WI 2, 268 Wis. 2d 16, 673 N.W.2d 65 and Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 2000 WI 26, 233 Wis. 2d 314, 607 N.W.2d 276. Because it does not recognize the judicial history of interpretations of terms in a Commercial General Liability (CGL) insurance policy, it relies entirely on American Girl, which decision was a sea change in judicial interpretations of "property damage" in a CGL policy, as I explain more fully below.

¶51 At times the majority opinion misuses foundational commercial analyses such as the integrated system, economic loss doctrine and their interplay with the three-step process we use to determine whether there is coverage under a CGL insurance policy.[1] The majority opinion does so, in part, because it does not factor into its analysis the purpose of a CGL policy, when

---

[1] We articulated the three-step process in Wis. Pharmacal Co., LLC v. Neb. Cultures of Cal., Inc., 2016 WI 14, ¶22, 367 Wis. 2d 221, 876 N.W.2d 72 (citing Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶22, 360 Wis. 2d 129, 857 N.W.2d 136). First, we examine the facts of the claim to decide "whether the policy makes an initial grant of coverage." Pharmacal, 367 Wis. 2d 221, ¶22. If so, we examine whether any policy exclusions preclude coverage. Id. Lastly, "we analyze exceptions to the exclusion to determine whether any exception reinstates coverage." Id.

it is purchased by a contractor to cover liability that a contractor may have to another person, for bodily injury to them or to their property. Stated otherwise, a CGL policy has been held to cover the risk of tort liability of a contractor that could arise from the contractor's acts that injure other persons or their property.

¶52 I agree that the facts are as yet too undeveloped to determine each of the coverage defenses mounted by General Casualty, West Bend Mutual Insurance and Acuity Mutual Insurance. Therefore, I would affirm the court of appeals. In so doing, I fully examine the judicial history of the risk that a CGL policy had been held to cover and the unarticulated change of potential coverage for a CGL policy that was first accomplished in American Girl. I also explain the limited application of the integrated systems analysis employed in Pharmacal. In so doing, I concur in the remand ordered by the majority opinion.

## I. DISCUSSION

¶53 Insurance policies insure against various risks of liability that may be generated by the insured. As a general matter when a contractor is the insured, a CGL policy insures the risk that the contractor may be negligent and cause damage to other persons or their property. Restatement of Law, Liability Insurance, Ch. 1, § 7. If the damages are purely economic, contract remedies, not tort remedies, are available. Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc., 148 Wis. 2d 910, 916, 437 N.W.2d 213 (1989). This conclusion is grounded in the economic loss doctrine, which precludes purely

economic damages due to a defective product or service that are disguised as tort claims unless personal injury or damage to property other than the defective product are present. Daanen & Janssen, Inc. v. Cedarapids, Inc., 216 Wis. 2d 395, 402, 573 N.W.2d 842 (1998). Whether the damage to property is to "other property" is sometimes difficult to ascertain.

¶54 In East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858 (1986), the United States Supreme Court explained why there are occasions when determining whether the damaged property was, or was not, that of another is difficult. In reasoning to its conclusion, the Court employed an integrated systems analysis.

¶55 There, charterers of supertankers brought suit against the turbine manufacturer, claiming design and manufacturing defects that caused supertankers to malfunction while on the high seas. Damages were sought. Id. at 860. In coming to its decision the Court said, "In the traditional 'property damage' cases, the defective product damages other property. In this case, there was no damage to 'other' property. . . . [The] supertanker's defectively designed turbine components damaged only the turbine itself." Id. at 867. In so concluding, the Court regarded each turbine as a single integrated unit. Id. The Court explained, "Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of 'property damage' in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability." Id.

¶56 Whether damage that occurs through the acts of the insured requires damage to other property for CGL coverage varies state by state.  See James Duffy O'Connor, What Every Court Should Know About Insurance Coverage for Defective Construction, 5 J. Am. Coll. Constr. L. No. 1 (2011) (explaining that in states applying the business risk doctrine, the event insured is "the possibility that the goods, product or work of the insured . . . will cause bodily injury or damage to property other than the product or completed work itself, and for which the insured may be liable.").  See also, Jeffrey P. Aken & Tamara Hayes O'Brien, Contractor Coverage For Construction Claims Under CGL Policies, 44 Tort Trial & Ins. L.J. 993 (2009) (reviewing whether property damage must be to property other than that provided by the insured is decided differently in different jurisdictions).

¶57 Until American Girl, Wisconsin courts had concluded that the property damage addressed in a CGL policy was damage to other property.  Reviewing that history is important to understanding the case before us.  I begin with Vogel because it is an early and clearly stated case:  "The risk intended to be insured [in a CGL policy] is the possibility that the goods, products or work of the insured . . . will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable." Vogel, 236 Wis. 2d 504, ¶17 (citing Bulen v. West Bend Mut. Ins. Co., 125 Wis. 2d 259, 264-65, 371 N.W.2d 392 (Ct. App. 1985),

4

which quoted Weedo v. Stone-E-Brick, Inc., 405 A.2d 788, 791 (N.J. 1979)).[2]

¶58 Wausau Tile arose in the context of another CGL coverage dispute. Wausau Tile, 226 Wis. 2d at 266. It involved breach of warranty/contract, negligence and strict liability claims. Id. at 242.

¶59 Wausau Tile had combined Medusa concrete, aggregate, water and other materials to make Terra pavers. The pavers cracked and Wausau Tile sued County Concrete, claiming the Medusa concrete was defective. County Concrete referred the claim to its insurer, Travelers Insurance. Travelers moved to dismiss, claiming there was no damage to other property, which is the type of damage that was then necessary for a CGL policy to afford coverage.

> Physical harm to property other than the product itself may also be measured by the cost of repair or replacement of the product. Consequently, we must determine whether Wausau Tile has alleged repair or replacement costs as a measure of harm to property other than the defective product.

Id. at 248-49.

¶60 Travelers alleged it had no duty to defend on the breach of warranty/contract claims. Id. at 243. We agreed

---

[2] The majority dismisses our use of Vogel by adding "includes" to modify a Wis. Label quote as: "simply explains that the risk insured in a CGL policy includes 'damage to property other than to the product or completed work itself.' [Citing] [Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 2000 WI 26, ¶27, 233 Wis. 2d 314, 607 N.W.2d 276]." (Emphasis added.) Majority op., ¶23. However, in its conclusion that there was no initial grant of coverage, Wis. Label explained, "[CGL policies] provide coverage for the insured's liability for physical injury to, or loss of use of, another's property." Id., ¶33.

because the damages from those claims were purely economic and therefore, they were contract damages barred by the economic loss doctrine. Id. at 259.

¶61 In consideration of whether the insurer had a duty to defend County Concrete on the remaining tort claims, a key issue was whether the damage that occurred was to property other than the contracted for defective property.[3] Id. at 247 (the "economic loss doctrine does not preclude a product purchaser's claims of personal injury or damage to property other than the product itself"). "In short, economic loss is damage to a product itself or monetary loss caused by the defective product, which does not cause personal injury or damage to other property." Id. (quoting Daanen, 216 Wis. 2d at 402).

¶62 For many years, it was important to correctly resolve the question of what type of property damage was at issue because a CGL policy, prior to American Girl, had insured the risk of damage to "other property," not damage solely to the contracted for product or service. Vogel, 236 Wis. 2d 504, ¶17; Wis. Label, 233 Wis. 2d 314, ¶58. It was a performance bond that insured risk that the work performed would not meet the requirements of the contract under which it was performed. See Gaastra v. Vill. of Fairwater, 77 Wis. 2d 7, 252 N.W.2d 60

---

[3] The majority opinion does not understand the two decisions we made in Wausau Tile, wherein we denied coverage for the contract claims and explained potential coverage existed for the tort claims when a defective product causes "personal injury or damage to other property." Wausau Tile, Inc. v. Cnty. Concrete Corp., 226 Wis. 2d 235, 247, 259, 593 N.W.2d 445 (1999).

6

(1977); Kniess v. Am. Sur. Co. of N.Y., 239 Wis. 261, 300 N.W. 913 (1941).

¶63 Accordingly, we agreed with Travelers, concluding that damage to the pavers themselves was not damage to other property. We determined other property was not damaged by the allegedly defective cement because the pavers constituted an integrated system or product where one component could not be separated from the other components. Wausau Tile, 226 Wis. 2d at 249 (citing Restatement (Third) of Torts § 21 cmt. e (1997), which acknowledged and explained the use of the integrated systems rule).

¶64 Our opinion in Wausau Tile reasoned that "[d]amage by a defective component of an integrated system to either the system as a whole or other system components is not damage to 'other property.'" Id. (citing East River S.S., 476 U.S. at 867-68). The "United States Supreme Court has recognized that courts have interpreted the Supreme Court's decision in East River S.S. as standing for the proposition that when harm results from a defective component of a product, the product itself is deemed to have caused the harm." Wausau Tile, 226 Wis. 2d at 250 (citing Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 883 (1997)).

¶65 American Girl also involved a CGL coverage claim. However, American Girl provided coverage for contract damages, which was an unarticulated sea change from our prior holdings. Before American Girl, the first step of our three-step coverage analysis for a CGL policy had been to assess whether there was damage to property other than or in addition to the insured's

defective work. If that were not the case, as <u>American Girl</u> may have held but did not articulate, CGL policies would function as performance bonds. <u>Am. Girl</u>, 268 Wis. 2d 16, ¶94 (Crooks, J., dissenting).

¶66 The claim in <u>American Girl</u> was that Renschler, the general contractor for constructing a building, breached its warranty by failing to construct a building that was free from defects as it warranted it would do in the construction contract. <u>Id.</u>, ¶¶4, 21. Breach of warranty is a contract claim. <u>Tietsworth v. Harley-Davidson</u>, 2007 WI 97, ¶10, 303 Wis. 2d 94, 735 N.W.2d 418.

¶67 American Family Insurance argued that because American Girl's claim was for breach of warranty/breach of contract it was not an "occurrence" under its policy because CGL policies are not intended to cover contract claims arising out of the insured's defective work. <u>Id.</u>, ¶39.[4] While acknowledging that it had been held that CGL policies do not cover claims arising out of the insured's defective work, <u>American Girl</u> shifted the focus of the allegation posed by American Family and responded that the lack of coverage in the past had occurred due to business risk coverage exclusions in insurance policies.[5] <u>Id.</u>

---

[4] Faulty workmanship is not an accident unless it causes an unexpected harm, and occurrences are defined as accidents. <u>Smith v. Anderson</u>, 2017 WI 43, ¶91, 374 Wis. 2d 715, 893 N.W.2d 790 (Abrahamson, J., dissenting); <u>Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.</u>, 2004 WI 2, ¶5, 268 Wis. 2d 16, 673 N.W.2d 65.

[5] It was possible to find an initial grant of coverage due to faulty work of the contractor when that contracted for work harmed other property and then to deny coverage based on the policy's business risk exclusion to coverage. However, we had repeatedly concluded that there was no property damage of the type required by a CGL policy, when no property of another was

However, business risk exclusions could apply only if there had been an initial grant of coverage under the first step of our coverage analysis to which the exclusion was then applied at the second step of our analysis.

¶68 In shifting the focus of the contention American Family Insurance actually made, American Girl ignored years of our decisions that had held that under a CGL policy, the term "property damage" required damage to property other than or in addition to damage to the contracted for product or services. Stated otherwise, nowhere in the American Girl decision does it reflect any recognition that the words of the policy defining property damage repeatedly had been interpreted by this court to require damage to property other than the product Renschler produced for American Girl.[6] The majority opinion got by what may have been an initial stumbling block by never addressing the "other property" concern and concluding that the soil settlement was the result of a subcontractor's alleged negligence. Id., ¶¶5, 9. However, alleged negligence of a subcontractor would enter only at the third step of our coverage analysis where we consider exceptions to any policy exclusions found during the second step of the analysis.

¶69 American Girl's providing coverage under a CGL policy for damage because of the defective work of a contractor that damaged no identified other property was a huge sea change from

damaged. See decisions pre-American Girl discussed above.

[6] It was undisputed that the damage at issue in American Girl was solely to the defective building that Renschler contracted for and constructed. Id., ¶¶13-16.

9

our past decisions. In past cases, personal injury or property damage to another was necessary to afford an initial grant of coverage under a CGL policy. Wausau Tile, 226 Wis. 2d at 248-49; Vogel, 236 Wis. 2d 504, ¶17; Bulen, 125 Wis. 2d at 264-65; Wis. Label, 233 Wis. 2d 314, ¶58. Because American Girl did not address the question that American Family Insurance posed to find an initial grant of coverage, American Girl did not address whether the damaged property was "other property." In so doing, it effected a significant change in insurance law, and it did not tell the reader about the change that it was making.[7]

¶70 Pharmacal presented another CGL policy dispute. The majority contends that Pharmacal "flatly contradicted prior cases without addressing those conflicts head on."[8] The majority opinion cites not one single case to support this broad assertion. However, as I explained above through the use of this court's past opinions, it is the majority opinion that has not undertaken a sufficient study of the judicial history of CGL policies. Our decision in Pharmacal did not recognize the significant change in the definition of property damage under a CGL policy that American Girl may have made but did not articulate. Instead, Pharmacal applied our past requirement that property damage under a CGL policy must include damage to more than the insured's work.

---

[7] Perhaps the court did not recognize that it was making a change in CGL insurance law because the court sat five in American Girl. The majority was three justices, with two justices dissenting and two justices not participating.

[8] Majority op., ¶3.

10

¶71 In Pharmacal, problems arose when, at Pharmacal's request, Nutritional Manufacturing provided a probiotic tablet that incorporated a different species of bacteria than Pharmacal requested. Pharmacal, 367 Wis. 2d 221, ¶5. Nebraska Cultures had provided the defective bacterium that Nutritional had used. Id. Once provided, the bacterium was mixed with other ingredients and compressed into tablet form. Id. None of the ingredients could be separated from one another after compression into a tablet. Id.

¶72 Netherlands Insurance and Evanston Insurance moved to dismiss Pharmacal's complaint. They contended that Pharmacal's underlying claims arose from incorporating a defective ingredient into Pharmacal's probiotic supplement tablets. The insurers asserted that this error did not damage other property because the tablets were an integrated system and therefore, the other ingredients in the tablets could not be separated out in a way that would demonstrate damage to "other property." Damage to other property was required in order to have an initial grant of coverage under their CGL policies. Id., ¶24 (citing Wis. Label, 233 Wis. 2d 314, ¶27).

¶73 In assessing whether the defective ingredient damaged other property, we identified the usual three steps to determine whether there was potential policy coverage of the claim. Pharmacal, 367 Wis. 2d 221, ¶22. We began with whether there was an initial grant of coverage under the terms of the policy. Id., ¶23. We addressed the "standard CGL definition of property damage."

11

> The risk intended to be insured [in a CGL policy] is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to <u>property other than to the product or completed work itself</u>, and for which the insured may be found liable.

<u>Id.</u>, ¶24 (quoting <u>Wis. Label</u>, 233 Wis. 2d 314, ¶27 (alteration in original)). We reasoned that the damage to "other property" requirement was important because a "CGL policy. . . is not a performance bond." <u>Pharmacal</u>, 367 Wis. 2d 221, ¶26.

¶74 In order to assess whether the damage that occurred from the defective bacterium caused damage to other property, we analyzed "whether a supplement tablet is an integrated system because if it is, damage to the system has been defined as damage to the product itself, not damage to other property." <u>Id.</u>, ¶27 (citing <u>Wausau Tile</u>, 226 Wis. 2d at 249).[9] We employed an integrated systems analysis because of the factual difficulty in determining whether the defective bacterium damaged only itself or also damaged other property.

¶75 We reasoned that an integrated system analysis is sometimes necessary when evaluating whether there is an initial grant of coverage under a CGL policy because of the historic requirement that damage to property of another was required for an initial grant of coverage. <u>Wis. Label</u>, 233 Wis. 2d 314, ¶27; <u>East River S.S.</u>, 476 U.S. at 867-68. Accordingly, whether to

---

[9] The majority opinion errs when it implies that <u>Pharmacal</u> concludes that an integrated systems analysis always is necessary when evaluating coverage under a CGL policy. Majority op., ¶31. Whether an integrated systems analysis is appropriate depends on the factual setting from which CGL coverage is asserted. <u>Wausau Tile</u>, 266 Wis. 2d at 249; <u>Pharmacal</u>, 367 Wis. 2d 221, ¶31.

12

employ an integrated systems analysis depends on the facts under which the insurance coverage dispute arises. We analyzed the undisputed facts to decide whether the tablet was to be treated as a unified whole or "whether a defective component can be separated out such that the claimed damage constitutes damage to property other than the defective component itself." Pharmacal, 367 Wis. 2d 221, ¶28; see also East River S.S., 476 U.S. at 867-68 (explaining that a defective component of a product does not damage other property when the component is part of an integrated system). In Pharmacal, we concluded that once ingredients were compressed into tablets, a unified whole was created, and therefore, there was no property damage to other property, which a CGL policy had required for an initial grant of coverage.

¶76 We discussed how supplying an incorrect bacterium affected a potential grant of coverage by reviewing whether supplying that bacterium was an "occurrence" under the Netherlands policy. Pharmacal, 367 Wis. 2d 221, ¶¶51-56. We concluded that the breach of contract in supplying an incorrect bacterium was not an "occurrence" in and of itself. Id., ¶52. Glendenning's Limestone & Ready-Mix v. Reimer, 2006 WI App 161, ¶39, 295 Wis. 2d 556, 721 N.W.2d 704 (explaining that "faulty workmanship in itself is not an 'occurrence'——that is, 'an accident'——within the meaning of the CGL policy"). Property damage or personal injury resulting from the breach must follow if there is to be an initial grant of coverage because the policy at issue was a CGL policy. Pharmacal, 367 Wis. 2d 221, ¶56. Accordingly, the property damage necessary was damage to

13

other property, which had not occurred. Id. Therefore, there was no initial grant of potential coverage.

¶77 The majority opinion overrules Pharmacal, even though no party asked the court to do so.[10] It overrules Pharmacal because it does not understand the integrated system analysis and why it was applied in that case to determine whether there was property damage to other property once tablets were constructed.[11] It also does not understand the sea change that may have occurred in American Girl, wherein damages for breach of warranty (a contract claim) were covered by American Family's CGL policy without a finding that the breach of warranty had caused damage to other property.

¶78 The majority opinion asserts, "Pharmacal wrongly stated that 'property damage' must be to 'other property' for purposes of determining an initial grant of coverage in a CGL policy."[12] The majority cites Kalchthaler v. Keller Constr. Co., 224 Wis. 2d 387, 591 N.W.2d 169 (Ct. App. 1999), in support of that contention. However, Kalchthaler employed our pre-American Girl CGL analysis relating to other property. Kalchthaler involved poorly installed windows that leaked, and due to that

---

[10] Majority op., ¶31. It is risky to overrule a past decision without briefs from the parties and when the majority does not understand the commercial doctrines that drive the past decision.

[11] We have held that certain types of contamination provided through the insured's action, when they pose personal injury dangers, can constitute property damage under a CGL policy. Northridge Co. v. W.R. Grace & Co., 162 Wis. 2d 918, 937-38, 471 N.W.2d 179 (1991). Pharmacal did not raise those concerns.

[12] Majority op., ¶3.

14

leakage damaged draperies and wallpaper. Id. at 397. In explaining its reasoning, Kalchthaler said, "Under well-established case law, a CGL policy does not cover faulty workmanship, only faulty workmanship that causes damage to other property." Id. at 395. The damage to other property was damage to draperies and wallpaper.

¶79 As it criticizes Pharmacal, the majority opinion states the proper standard for assessing property damage under a CGL policy:

> This kind of policy is designed to insure against "the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable."

(citing Wis. Label, 233 Wis. 2d 314, ¶27 (emphasis in the original)).[13] The majority opinion then relates that when considering coverage, "we examine the terms of the policy and compare it to the facts of record. . . . Whether the insuring agreement confers coverage depends upon whether there has been 'property damage' resulting from an 'occurrence' within the meaning of the CGL policy language."[14]

¶80 I agree with all of that, but what the majority misses is that the words, "property damage," in a CGL policy have had at least 24 years of interpretation by this court as requiring damage to property other than the contracted-for product.[15] This

---

[13] Id., ¶15.

[14] Id., ¶16.

[15] See e.g., Wausau Tile, 226 Wis. 2d at 248-49; Vogel v. Russo, 2000 WI 85, ¶17, 236 Wis. 2d 504, 613 N.W.2d 177; Northridge, 162 Wis. 2d at 932, Wis. Label, 233 Wis. 2d 314,

requirement serves the purpose of keeping the risk for which a CGL policy is issued (see Wis. Label quoted above) from risks that may be insured by a performance bond such as poor contract performance. The words of the policy are key, but the reader must understand the judicial history that surrounds their interpretation. See In re Estate of Atkinson, 19 Wis. 2d 272, 278, 120 N.W.2d 109 (1963) (explaining that the meaning of even statutory terms are affected by prior judicial interpretations).

¶81 The majority also finds fault with Pharmacal's use of Vogel and Wis. Label because the "portions cited in Pharmacal were not in the initial grant of coverage discussions; they were general comments on the purpose of a CGL policy. . . . The cited language simply explains that the risk insured in a CGL policy includes 'damage to property other than to the product or completed work itself.'"[16] The majority is only partially right. Discussions of property damage were in general comments on the purpose of a CGL policy, but they were repeated when initial grants of coverage were discussed. Vogel, 236 Wis. 2d 504, ¶¶17, ¶21; Wis. Label, 233 Wis. 2d 314, ¶¶27, ¶33.

¶82 The majority opinion finds fault with Pharmacal's use of the integrated systems analysis.[17] The majority also characterizes the economic loss doctrine as "tort principles" that "[implicate] the integrated systems analysis."[18] "Although

---

¶27.

[16] Majority op., ¶23.

[17] Id., ¶24.

[18] Id., ¶26.

both the economic loss doctrine and the integrated systems analysis may appear in the same opinion, they address different commercial concerns. Simply stated, the economic loss doctrine is a judicial doctrine that prevents suing in tort for damages that are simply breach of contract damages, unless other property also has been damaged. Foremost Farms USA Coop. v. Performance Process, Inc., 2006 WI App 246, ¶¶13-14, 297 Wis. 2d 724, 726 N.W.2d 289; Kaloti Enters., Inc. v. Kellogg Sales Co., 2005 WI 111, ¶27, 283 Wis. 2d 555, 699 N.W.2d 205. The integrated systems analysis is used to determine whether there has been damage to property other than the work of the insured, when an integrated system is alleged to be factually present. East River S.S., 476 U.S. at 867 (see above). "If damaged property is not 'other property' under the 'integrated system' test, the economic loss doctrine applies and tort claims are barred." Foremost Farms, 297 Wis. 2d 724, ¶16.

¶83 The majority opinion relies on Haley v. Kolbe & Kolbe Millwork Co., 866 F.3d 824 (7th Cir. 2017), to support its attack on Pharmacal.[19] It quotes Haley as criticizing Pharmacal's use of the economic loss doctrine in the context of an insurance coverage dispute.[20] Haley has a long way to go in

---

[19] Id., ¶29.

[20] In its discussion of Haley v. Kolbe Millwork Co., 866 F.3d 824 (7th Cir. 2017), the majority approves Haley's statement that applying the economic loss doctrine to an insurance coverage dispute is exactly what Pharmacal did. Majority op., ¶29. What Pharmacal actually says is, "the economic loss doctrine does not control a coverage dispute and, therefore is not at issue here." Pharmacal, 367 Wis. 2d 221, ¶32.

17

providing an accurate articulation of commercial doctrines and in its reading of Pharmacal. First, Haley characterizes the integrated-system rule as a "common-law rule from the so-called 'economic loss' doctrine." Id. at 827 (emphasis added). However, they are separate and distinct commercial doctrines that have been addressed by the United States Supreme Court, as I have explained above. See East River S.S., 476 U.S. at 866-68.

¶84 In commenting on Wausau Tile, Haley asserts that, "[a]s the cement was an integral component of the finished blocks, the cement had not damaged any 'other property,' and the economic-loss doctrine applied." Haley, 866 F.3d at 828. Haley also asserts that "The economic-loss doctrine generally does not apply to insurance-coverage disputes . . . but in 2016, the Wisconsin Supreme Court extended Wausau Tile's integrated-system analysis to an insurance case involving a general-liability policy similar to the ones at issue here." Id. Those statements from Haley support its belief that the integrated systems analysis is part of the economic loss doctrine. That is an incorrect understanding of both commercial doctrines.

¶85 In regard to the 5 Walworth dispute that is pending before us, the integrated systems analysis could be discussed in regard to the pool's use of shotcrete in its construction. However, the significant and continual water leakage that followed construction of the pool may well have damaged property of the owner and therefore damaged other property. This could support the conclusion that an occurrence (an accident) had occurred that caused property damage to structures outside of

the pool itself. It also is not possible to determine conclusively whether the re-bars used in the pool construction were a cause of the cracking that resulted in continual pool leakage. Those are fact-based determinations. And finally, because it is not unusual for construction projects of this size to have some initial problems that are resolved, the question of when John Engerman discovered the leak that eventually proved so significant also would benefit from further factual development.

## II. CONCLUSION

¶86 Accordingly, given all of the law described above, I would affirm the court of appeals. In so doing, I have explained the historic risk that a CGL policy had been purchased to cover and I affirm the limited use of the integrated systems analysis employed in <u>Pharmacal</u>. Therefore, I respectfully concur.

¶87 ANNETTE KINGSLAND ZIEGLER, C.J. *(concurring in part, dissenting in part).* I agree with the majority that Wisconsin Pharmacal Co. v. Nebraska Cultures of California, Inc.[1] should be overruled. I also agree that General Casualty and Acuity are not entitled to summary judgment.[2] However, I disagree with the majority's conclusion that West Bend is not entitled to summary judgment. The undisputed facts demonstrate that West Bend's insured, Engerman Contracting, Inc.,[3] knew of the property damage at issue in this case prior to the policy period with West Bend. Before the policy period, Engerman knew the pool complex was leaking. The leaking was, at least in part, caused by cracking in the pool walls. Engerman therefore knew of a "resulting loss of use of th[e] property," which constitutes "property damage" under West Bend's policy. As a result, Engerman knew of the property damage prior to the policy period, and the known-loss provision precludes coverage from West Bend. These undisputed facts show that West Bend is entitled to summary judgment.

¶88 "We will affirm a grant of summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Baumeister v. Automated Prods., Inc., 2004 WI 148, ¶11, 277 Wis. 2d 21, 690

---

[1] 2016 WI 14, 367 Wis. 2d 221, 876 N.W.2d 72.

[2] I therefore join the majority opinion except for ¶¶5, 7, 39-42, and 49.

[3] Engerman Contracting, Inc., and John Engerman, Engerman Contracting's President and CEO, are both "insureds" under West Bend's policy. Accordingly, I refer to them collectively as "Engerman."

1

N.W.2d 1. "A factual issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party." Midwest Neurosciences Assocs., LLC v. Great Lakes Neurosurgical Assocs., LLC, 2018 WI 112, ¶80, 384 Wis. 2d 669, 920 N.W.2d 767.

¶89 West Bend's policy contains a known-loss provision precluding coverage for "property damage" if the insured knew that the property damage "had occurred, in whole or in part." The full provision precludes coverage unless,

> [p]rior to the policy period, no insured . . . and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

The policy also defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property," and as "[l]oss of use of tangible property that is not physically injured."

¶90 Engerman has no coverage under West Bend's policy because Engerman knew of the property damage prior to the policy period. The policy period commenced on October 27, 2013. Before that time, Engerman received numerous emails notifying him of the property damage. He was therefore aware that "loss of use" of the pool, which constitutes part of the "property damage" under West Bend's policy, had occurred.

2

¶91 On August 19, 2012, Engerman received an email from 5 Walworth, LLC, informing him that "the wading pool was empty" and "a pool leak was found and supposedly fixed yesterday morning——unsuccessfully unfortunately." Engerman replied the next day that he would "like to pay a visit," and he later stated in his deposition that he did so. Engerman followed up on August 27, stating "the stone is being replaced [and] that was also a source of the water leak." Engerman's attempts at resolving the leak proved unsuccessful. On June 21, 2013, Engerman was forwarded an email complaining "the kiddie pool has been leaking since day one, and you guys have come up with all sorts of excuses. Clearly it is a LEAK. Fix the damn leak." The email continued, "The auto fill is running 24/7 and obviously can not keep up with the leak."

¶92 Engerman did aver in his deposition that these emails, "to the best of [his] knowledge," discussed leaking that was "always contained to [a] trough issue that [he] thought [was] rectified at the end of that summer of 2012," and he did "not [hear of] anything prior – or afterwards of any ongoing pool issues directly." However, Engerman received one of these emails after the "summer of 2012" in June 2013, still before the policy period commenced. Additionally, as stated in the engineering firm's report, "It was reported that significant cracking developed in the shotcrete walls and bottom of the pools soon after construction in 2012, and excessive water leakage has continued to occur."

3

¶93 Based on the evidence in the record, Engerman clearly knew of the "property damage" before the policy period commenced. The definition of "property damage" in West Bend's policy includes "all resulting loss of use of that property." Such loss of use occurred because, as Engerman undisputedly knew prior to the policy period, the pool complex was leaking. Whether Engerman thought this leak was caused by cracking in the pool walls or a "trough issue" is irrelevant. The cracks in the pool walls were present since 2012, and the pool continued leaking notwithstanding Engerman's attempts at rectifying a "trough issue." The only reasonable conclusion, based on the evidence in the record, is that at least some of the leaking Engerman knew about prior to the policy period was caused by cracks in the pool walls.

¶94 Because Engerman knew there was "resulting loss of use of th[e] property," he knew there was "property damage" prior to West Bend's policy period. All further "property damage" alleged in 5 Walworth's complaint stemmed from the cracking in the pool walls and therefore constitutes a "continuation, change or resumption of such . . . 'property damage.'" As a result, under West Bend's policy, all resulting property damage is "deemed to have been known [by Engerman] prior to the policy period," precluding coverage for such property damage. Based on these undisputed facts, West Bend is entitled to summary judgment.

¶95 For the foregoing reasons, I respectfully concur in part and dissent in part.

4

¶96  I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this writing.